FILED

2009 Sep-29  PM 12:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

STEPHENS WHOLESALE            }
BUILDING SUPPLY,             }
                             }
        Plaintiff,           }
                             }              CASE NO. 1:06-cv-0329-SLB
vs.                          }
                             }
UNITED STATES FIRE           }
INSURANCE COMPANY,           }
                             }
        Defendant.           }

## MEMORANDUM OPINION

This case is before the court on defendant's "Motion for Declaratory Relief and/or Final Summary Judgment with Respect to Breach of Contract Claims for Damage to the East/Rear Wall" (Doc. 123), "Motion for Final Declaratory Relief and/or Final Summary Judgment with Respect to Claims for Damage Caused by Hurricane Ivan" (Doc. 112), and "Motion for Final Declaratory Relief and/or Final Summary Judgment with Respect to Claims for Damage to the East/Rear Wall Contract and Bad Faith" (Doc. 121).[1]

On June 16, 2009, the Magistrate Judge entered a Report and Recommendation regarding documents 121 and 123 (Doc. 139), and another Report and Recommendation regarding document 112 (Doc. 138). In document 139, the Magistrate Judge recommended that summary judgment be denied as to document 123, regarding plaintiff's

_____

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

breach of contract claims for damage to the east/rear wall, and granted as to document

121, regarding plaintiff's claims for bad faith.  Plaintiff filed objections (Doc. 140) to the

Magistrate Judge's Report and Recommendation (Doc. 139), recommending the grant of

summary judgment on plaintiff's bad faith claims; defendant responded (Doc. 146).

Defendant also filed objections (Doc. 142) to the Magistrate Judge's Report and

Recommendation (Doc. 139), recommending the denial of summary judgment on

plaintiff's breach of contract claims for damage to the east/rear wall.  In document 138,

the Magistrate Judge recommended that summary judgment be denied as to plaintiff's

breach of contract claims for damage caused by Hurricane Ivan, to which defendant

objected (Doc. 141).  On July 1, 2009, the Magistrate Judge filed an amendment to

document 139 (Doc. 143).

Having carefully reviewed and considered *de novo* all the materials in the court

file, including the Report and Recommendations, defendant's Objections, plaintiff's

Objections, defendant's Response, and the amendment to document 139, the court is of

the opinion that the Magistrate Judge's Report regarding document 123 (breach of

contract claims for damage to the east/rear wall) is due to be ADOPTED IN PART and

REJECTED IN PART, and his Recommendation is due to be ACCEPTED.  Defendant's

"Motion for Declaratory Relief and/or Final Summary Judgment with Respect to Breach

of Contract Claims for Damage to the East/Rear Wall" (Doc. 123) is due to be DENIED.

Further, the court is of the opinion that the Magistrate Judge's Report regarding document

112 (breach of contract claims for damage caused by Hurricane Ivan) is due to be

ADOPTED IN PART and REJECTED IN PART, and his Recommendations are due to

be ACCEPTED IN PART and REJECTED IN PART.  Defendant's "Motion for Final

Declaratory Relief and/or Final Summary Judgment with Respect to Claims for Damage

Caused by Hurricane Ivan" (Doc. 112) is due to be GRANTED IN PART and DENIED

IN PART.  Finally, the court is of the opinion that the Magistrate Judge's Report

regarding document 121 (bad faith claims) is due to be ADOPTED IN PART and

REJECTED IN PART, and his Recommendation is due to be ACCEPTED.  Defendant's

"Motion for Final Declaratory Relief and/or Final Summary Judgment with Respect to

Claims for Damage to the East/Rear Wall Contract and Bad Faith" (Doc. 121) is due to be

GRANTED.

## I.  <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the

record shows "that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

party bears the initial burden of showing no genuine issue of material fact and that it is

entitled to judgment as a matter of law.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

157 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the

moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond

the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see*

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh

the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence,

and the drawing of inferences from the facts are left to the jury, and, therefore, evidence

favoring the non-moving party is to be believed and all justifiable inferences are to be

drawn in his favor. *See id.* at 255.  Nevertheless, the non-moving party "need not be

given the benefit of every inference but only of every *reasonable* inference."  *Graham v.*

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing Brown v. City of

Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

## II.  <u>FACTUAL SUMMARY</u>

### A.    **THE COMMERCIAL INSURANCE POLICIES**

The defendant, United States Fire Insurance Company ("U.S. Fire"), issued a

commercial policy, policy number 2441858058, which provided coverage to the plaintiff

Stephens Properties, Inc. ("Stephens Wholesale") for the policy period from October 5,

2003, to October 5, 2004.  (Doc. 80 at 2, ¶ 1.)  U.S. Fire issued a second commercial

property insurance policy, policy number 2441874051, for the policy period from October 5, 2004 to October 5, 2005.  (Doc. 106 at 1, ¶ 1.)  The policies covered a commercial building in Childersburg, Alabama known as "the Beaunit Building."  (*Id.*)

It is undisputed that both policies contain provisions governing methods for calculating the values of losses, which permit the calculation of insurance benefits on a "replacement cost value" ("RCV") basis, assuming all pertinent conditions are met.  (Doc. 80 at 2, ¶ 4.)  That said, one policy condition for receiving insurance benefits on a RCV basis is that the damage must have been repaired or replaced as soon as reasonably possible after the loss.  (*Id.*)  The property damage at issue in this case has not been repaired or replaced and this court determined that Stephens Wholesale is not entitled to payment of RCV benefits unless and until the damage is repaired or replaced.  (*Id.* at 6, ¶ 1; Doc. 118, Ex. 29 at 99.)  Therefore, unless and until the damage is repaired or replaced, the calculation of benefits must be performed under the "actual cash value" ("ACV") provision of the policy.  (Doc. 80 at 2, ¶ 4.)  ACV is calculated as the amount it would cost to repair or replace the property, at the time of the loss or damage, with material of like kind and quality, subject to deduction for deterioration, depreciation, and obsolescence.  (*Id.* at 3 n.1.)

**B.____THE CLAIMS MADE BY STEPHENS WHOLESALE**

Stephens Wholesale has claimed three losses in this suit: 1) policy BDV80018518 - the Wind Loss claim of February 5, 2004; 2) policy BDV00319946 - the Lightning Strike claim of July 25, 2005; and 3) policy BDV80019354 - the Hurricane Ivan claims of September 20, 2004 and February 7, 2006.  (Doc. 118, Ex. 29 at 107.)

1.____Facts Relating to the Wind Loss claim of February 5, 2004

On March 10, 2004, U.S. Fire received Stephens Wholesale's claim for damage to the east/rear wall of the Beaunit Building, as a result of a wind storm occurring on February 5, 2004.[2]  (Doc. 119, Ex. 1 at 1, ¶ 3.)   The following day, March 11, 2004, U.S. Fire assigned the claim to Premiere Insurance Adjusters, Inc. ("Premiere").  Thereafter, Mr. Eric Blaylock of Premiere, with Mr. Charles Stephens of Stephens Wholesale, scheduled an appointment for March 15, 2004, to inspect the damage to the Beaunit Building.  (*Id.* at ¶¶ 5-6.)

On March 15, 2004, at approximately 1:30 p.m., Mr. Blaylock arrived at the Beaunit Building.  (*Id.* at 2, ¶ 3.)  Mr. Stephens was not present.  (*Id.*)  Nevertheless, Mr. Blaylock met with Jerry Moore, the property manager for the Beaunit Building, and

---

[2] Throughout its investigation of the wind loss claim of February 5, 2004, U.S. Fire attempted to confirm the storm's occurrence.  (*See, e.g.*, Doc. 122 at ¶ 6.)  Because of their inability to confirm the storm's occurrence through research and interviews, U.S. Fire referred to the wind loss claim of February 5, 2004 as caused by an "alleged" wind storm. (*See id.* at  ¶ 2.)  Nevertheless, on January 5, 2005, U.S. Fire accepted coverage on the claim, and has on more than one occasion attempted to settle the claim.  (*Id.* at ¶ 36.)

George Bailey, a maintenance employee, and inspected the damage.  (*Id.*)  With the two

men, Mr. Blaylock inspected the area of claimed damage to the east/rear wall, as well as

the roof.  (*Id.* at 2, ¶ 3, 3, ¶ 1.)  Mr. Moore also pointed out damage further down the

wall, but explained that the damage was not storm related.  (*Id.* at 3, ¶ 3.)  Further, Mr.

Moore indicated that he and Mr. Bailey had already removed the majority of the fallen

brick.  (*Id.* at 2, ¶ 4.)  As a result, Mr. Blaylock was unable to assess the value of Stephens

Wholesale's claim for debris removal.  (*Id.*)  Mr. Blaylock did attempt to contact Mr.

Stephens to request a repair estimate and documentation of expenses incurred for the

debris removal, but was unable to contact him.  (*See id.* at 3, ¶¶ 2-4.)

On June 1, 2004, Mr. Blaylock asked Eric Parrish, a building estimator with

Construction Specialists Industries, LLC, to obtain an estimate of the cost to repair the

damage.  (*Id.* at 4, ¶ 3.)  Mr. Parrish submitted his report on June 11, 2004, estimating

$54,569.36 to repair the damaged area of the east/rear wall.  (*Id.* at 5, ¶ 2.)

On June 15, 2004, at U.S. Fire's instruction, Mr. Blaylock asked Ronald E. Martin,

P.E., a structural engineer, to inspect the Beaunit Building and determine the cause of

damage.  (*Id.* at ¶ 1.)  Mr. Martin agreed to do so.  (*Id.* at ¶ 3.)  Thereafter, on July 12,

2004, Mr. Blaylock wrote a letter to Mr. Stephens asking for available dates for Mr.

Martin to inspect the east/rear wall, but received no response.  (*Id.* at ¶ 4.)  After several

other attempts to contact Mr. Stephens, Mr. Blaylock, on August 19, 2004, sent Mr.

Stephens a certified letter explaining that, pursuant to U. S. Fire's request, he had

engaged a structural engineer to aid in evaluating the claimed loss.  (*Id.* at ¶ 5.)  The

following week, on August 26, 2004, Mr. Stephens responded by calling Mr. Blaylock to

inform him that he had retained the public adjusting firm of Alex N. Sill Company ("Alex

Sill") to represent Stephens Wholesale regarding the wind loss claim.  (*Id.* at ¶ 5.)  Mr.

Stephens also requested Mr. Martin's contact information.  (*Id.* at 6, ¶ 1.)

Mr. Stephens and Mr. Martin scheduled an appointment for October 6, 2004, so

that Mr. Martin could inspect the Beaunit Building.  (Doc. 119, Ex. 11, at 2, ¶ 1.)  That

said, Mr. Stephens cancelled the October 6, 2004 meeting for health reasons; the

inspection was reset for November 18, 2004.  (*Id.*)

On November 18, 2004, Mr. Martin and Mr. Stephens inspected the east/rear wall,

accompanied by Stephens Wholesale's public adjusters, Keith Brenneman and Michael

Werner from Alex Sill.  (*Id.*)    Following the inspection, Mr. Martin submitted his report,

concluding that there were a number of possible causes for the damage:

> [1]  Direct suction of the wind on the block; [2] Movement of the overall building
> with time due to wind, storms or thermal expansion; [3] Movement of the
> building due to collisions on the interior or exterior; anything striking the steel
> frame or walls can cause a movement of the exterior wall since it is attached only
> at the roofline.  It is fairly common in warehousing to have this happen; [4]
> Settlement of the foundations over time; [5] Other.

(*Id.* at Ex. B at 3, ¶ 5.)

On January 5, 2005, after reviewing Mr. Martin's report, Steve Kotzin, a property

field claim specialist with U.S. Fire, accepted coverage for the February 2004 wind loss

to the east/rear wall.  (Doc. 119, Ex. 1 at 7, ¶ 1; Doc. 119, Ex. 1 at Ex. J.)

Two days later, on January 7, 2005, Mr. Blaylock received a September 4, 2004 estimate prepared by Alex Sill's estimator, Mr. Brenneman, for repair or replacement of the east/rear wall. (Doc. 119, Ex. 1 at 7, ¶¶ 2-3.) Mr. Brenneman calculated that repair would require the entire replacement of two (walls) side by side, for a length of 350 feet to an expansion joint in the middle of the 685 foot wall, estimating a total cost of $489,009.03. (*Id.* at ¶ 3; Doc. 119, Ex. 16 at 92, lns. 16-21; Doc. 119, Ex. 17 at 8.)

Following Mr. Brenneman's report, U.S. Fire, on January 7, 2005, requested a joint inspection by Mr. Martin and Stephens Wholesale's adjusters. (Doc. 119, Ex. 1 at 7, ¶ 4.) Thereafter, on February 17, 2005, Mr. Martin, Mr. Blaylock, and a building consultant, Mark Wortham, of Construction Specialists, Inc., met Stephens Wholesale's adjusters, Mr. Werner and Mr. Brenneman at the Beaunit Building. (*Id.* at ¶ 5.) At the inspection, the group determined that the east/rear wall was not damaged to the extent claimed by Mr. Brenneman's September 4, 2004 estimate. (*Id.* at 8, ¶ 1.) Instead, the group determined that only 100 feet of the east/rear wall needed repair. (*Id.*) The group also determined that a deduction would be made for depreciation. (*Id.*)

On February 21, 2005, as a result of the February 17, 2005 inspection, Stephens Wholesale's adjusters confirmed that they were going to revise their initial estimate, but Mr. Werner informed Mr. Blaylock that the maximum rate of depreciation rate would be 35%. (Doc. 119, Ex. 19.) On February 23, 2005, Mr. Blaylock received Mr. Brenneman's revised estimate, dated February 21, 2005. The amount had been reduced to

$108,832.42.  (Doc. 119, Ex. 1 at 8, ¶ 2.)  Although Mr. Brenneman's new estimate called for the replacement of only 100 feet of the wall, as opposed to his original estimate that called for replacing the full 350 feet of the wall, the new estimate did not take into account the policy deductible, which was $10,000, or include a deduction for depreciation.  (*Id.*; Doc. 119, Ex. 20 at 7.)

Responding to the offer, Mr. Blaylock completed his revised estimate, totaling $68,494.55, which he sent directly to Mr. Werner on or about March 24, 2005.  (Doc. 119, Ex. 1 at 9, ¶ 1.)  This estimate likewise did not take into account the policy deductible or include the $37,672.00 deduction for depreciation of 45%, which Mr. Blaylock arrived at based on his investigation and the age and condition of the building. (*Id.* at ¶¶ 1, 3.)  Mr. Werner agreed to present the offer to Mr. Stephens, but Mr. Stephens rejected it. (*Id.* at ¶ 1.)

At this point, the major obstacle to reaching a settlement regarding the wind loss claim of February 5, 2004 became the applicable rate of depreciation.  Indeed, on May 4, 2005, Lynn Higgins of McGriff, Siebels and Williams, advised U.S. Fire that Mr. Stephens would not settle for any depreciation rate greater than 20%.  (Doc. 119 at Ex. 23.)  Then, on May 6, 2005, Mr. Stephens stated he would not accept a depreciation rate of greater than 5% on materials.  (Doc. 119, Ex. 24 at 71, ll. 16-21.)

After further discussing the necessary depreciation rate with Mr. Werner, Mr. Blaylock, on June 21, 2005, increased the amount payable by $4,999.18.  (Doc. 119, Ex. 1

10

at 9, ¶ 2.)  The revised estimate used a higher depreciation rate for the wall (56%) but a

lower depreciation rate for the roof (5%).  (Doc. 119 at Ex. 26.)  Stephens Wholesale

rejected the offer.

Following the rejected offer, on June 28, 2005, Mr. Blaylock consulted Mr. Martin

for input regarding an appropriate depreciation rate. (Doc. 119, Ex. 1 at 9, ¶ 4.)  Mr.

Martin conducted research and advised Mr. Blaylock that it would be fair and reasonable

to apply a 100 year life expectancy to the wall (equating to a depreciation rate of 1% per

year).  (Doc. 119, Ex. 11 at 4, ¶ 2.)  Because the wall system of the east/rear wall was

unsupported, it was Mr. Martin's opinion that it would depreciate at a rate greater than

one percent per year.  (*Id.*)  Stephens Wholesale, however, stresses that U.S. Fire had no

established standards on depreciation that stated 1% per year of life of the building would

be used.  (Doc. 118, Ex. 29 at 141, 146-47.)

Next, Mr. Werner, on or about July 18, 2005, submitted a demand for payment

totaling $98,013.88.  (Doc. 119, Ex. 29 at 7.)  In response to Mr. Werner's offer, on

August 17, 2005, Mr. Blaylock revised his own estimate by increasing it to $69,632.15.

(Doc. 119, Ex. 1 at 10, ¶ 2.)  Neither estimate included a deduction for the policy

deductible or for depreciation.  (*Id.*)  Subsequently, on August 25, 2005, when Mr.

Blaylock and Mr. Stephens discussed the $69,632.15 offer, Mr. Stephens rejected the

offer, but requested a letter confirming the offer be sent in writing.  (*Id.*)  Mr. Blaylock

stated he did so, though the proffered exhibit represents an offer of $68,494.55, not

$69,632.15.  (*Id.* at ¶ 2; Doc. 119 at Ex. 31.)


2.＿＿＿U.S. Fire Replaces Mr. Blaylock with Mr. Mike Mullis＿

During  the 2004 and 2005 hurricane seasons, U.S. Fire hired Mr. Mike Mullis of

Vericlaim, Inc. to adjust Stephens Wholesale's hurricane claims involving numerous

properties arising out of Hurricanes Ivan, Dennis, and Katrina.  (Doc. 119, Ex. 35, at 2, ¶

2.)  These claims  included damage to the Beaunit Building from each of these three

hurricanes.[3]  (*Id.*)  U.S. Fire reassigned the pending February 5, 2004 wind loss claim

regarding damage to the east/rear wall to Mike Mullis and on November 22, 2005 asked

Mr. Blaylock to close his file.  (Doc. 119, Ex. 1 at 10, ¶ 3.)

When the file was assigned to him, Mr. Mullis undertook his own evaluation of the

east/rear wall damage to form his own conclusions. (Doc. 119, Ex. 35 at 7, ¶ 3.)


3.＿＿＿Facts Relating to the Lightning Strike claim of July 25, 2005＿

On November 1, 2005, Mr. Charles Stephens first reported his claim that an

additional portion of the east/rear wall had fallen after a July 25, 2005 lightning strike.

This report was made orally to Mr. Mike Mullis.  (*Id.* at ¶ 2.)  U. S. Fire assigned the

claim to Mr. Mullis the same day.  (*Id.* at ¶ 3.)

---

[3] Claims regarding damage to the Beaunit Building from Hurricane Ivan remain
unresolved.  These claims are discussed *infra* Part II.B.6-7.

4.   U.S. Fire and Stephens Wholesale Continue Attempts to Settle the February 5, 2004 Wind Loss Claim and the July 25, 2005 Lightning Strike Claim

On November 14, 2005, Mr. Mullis first inspected the east/rear wall with Mr. Stephens.  (Doc. 119, Ex. 38 at 2.)

On January 10, 2006, Mr. Mullis, with the approval of U.S. Fire, met with Mr. Stephens and offered a total of $187,727.55 for both the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim for the east/rear wall damage.  (Doc. 119, Ex. 35 at 8, ¶ 3.)  This repair estimate was calculated on an ACV basis and included all alleged damage from both claims.  (*Id.*)  Stephens Wholesale rejected the offer of $187,727.55 the same day it was made.  (*Id.* at ¶ 4.)

Also on January 10, 2006, Mr. Stephens filed his initial complaint against U.S. Fire alleging breach of contract and bad faith against U.S. Fire with respect to the February 5, 2004 wind loss claim involving the east/rear wall.  (Doc. 1 at Ex. A.)

On January 12, 2006, Lynn Higgins, claims representative for McGriff, Seibels and Williams, informed U. S. Fire that Stephens Wholesale requested $2.3 Million for all the February 5, 2004 storm related claims for damage to the Beaunit Building with the exception of the wind loss claim, which was already the subject of the instant lawsuit. (Doc. 119 at Ex. 36.)

On February 7, 2006, Mr. Mullis again inspected the damage to the Beaunit Building, including the east/rear wall.  (Doc. 119, Ex. 35 at 5, ¶ 3.)  Following this inspection, Mr. Mullis recommended that  U.S. Fire hire a structural engineer and

13

building consultant to inspect the property. (*Id.* at 7, ¶ 4.) U.S. Fire approved the requests and Mr. Mullis hired Mr. Chris Witcher, a building consultant with Belfor U.S.A. Group, Inc., and Mr. Charles Whitley, a structural engineer with Engineering Design & Testing Corp. (*Id.*)

During the same February 7, 2006 inspection, Mr. Stephens informed Mr. Mullis that he had found the exact clay block for the east/rear wall used in the original construction of the building 50 years earlier. (Doc. 119, Ex. 39 at 2, ¶ 2). This clay block, costing approximately $14.00 per block, was significantly more expensive than the brick used by Mr. Mullis and U.S. Fire in their estimates. (*Id.*) Mr. Mullis asked for documentation of the vendor of this exact clay block so that he could consider that block in his estimate. (Doc. 119, Ex. 35 at 8, ¶ 5.) Mr. Mullis and Mr. Stephens disagree whether Mr. Mullis was ever provided with this specific information. Nevertheless, Mr. Mullis asked Mr. Whitley to locate a brick that would be as close a match to the original as possible. (*Id.*) According to Mr. Mullis, Mr. Whitley was able to find a less expensive brick, similar in size and material, but Mr. Stephens declined to accept it, claiming it was not like kind and quality. (*Id.*) The inability of Mr. Stephens and U.S. Fire to agree on the appropriate type of brick became a major obstacle in reaching a settlement on the east/rear wall claims.

After the February 7, 2006 inspection, Mr. Mullis revised his estimate. He added an area at the southeast corner of the east/rear wall to the scope of repairs and also added

some additional repairs that a local contractor (whom he had asked to review the estimate) thought were reasonable.  (*Id.* at 9, ¶ 2.)  Then, on February 17, 2006 and February 27, 2006, with his revised estimate in hand, Mr. Mullis again met with Mr. Stephens.  (*Id.*)

At the February 2006 meetings, Mr. Mullis presented a settlement offer to Mr. Stephens based on calculation of separate ACV estimates of $64,449.29 for the wind loss claim, and $148,406.35 for the lightning strike claim.  (*Id.*)

On April 7, 2006, Mr. Mullis again met with Mr. Stephens.  (*Id.*)  During this meeting, Mr. Stephens stated that Stephens Wholesale did not want to settle the east/rear wall claim for the July 2005 lightning damage without also settling the east/rear wall February 5, 2004 wind storm claim. (Doc. 119, Ex. 49 at 2, ¶ 1.)  Mr. Stephens also stated that he would settle all claims for the building for a total of $1,300,000.00.  (Doc. 119, Ex. 35 at 9, ¶ 2.)  Mr. Mullis, however, replied that he could not justify recommending to U.S. Fire that amount of money to settle the claims and he recommended against paying this demand.  (*Id.*)

On April 19, 2006, Mr. Mullis spoke with Mr. Stephens and the public adjusters from Alex Sill on a conference call.  Mr. Stephens wanted a personal meeting with Mr. Mullis and the Alex Sill adjusters outside the presence of experts. (*Id.* at 6, ¶ 3; Doc. 119, Ex. 40 at ¶¶ 1-2.)  On May 1, 2006, however, Mr. Stephens agreed to allow Mr. Mullis to bring experts retained by Mr. Mullis to inspect the property if they were accompanied by

15

Stephens Wholesale's public adjusters. (Doc. 119, Ex. 35 at 6, ¶ 4.) Thereafter, Mr. Mullis made arrangements for Mr. Whitley and Mr. Witcher to assist in evaluation of the east/rear wall damage. (*Id.*)

On May 9, 2006, the following persons inspected all claimed areas of damage at the Beaunit Building: the Alex Sill public adjusters, Mr. Werner and Mr. Brenneman; Stephens Wholesale's Engineer, Mr. Chris Tucker; Mr. Mullis; engineer Mr. Whitley; and building repair consultant Mr. Witcher. (*Id.* at ¶¶ 4-5.)

Mr. Witcher, on May 15, 2006, submitted a report to Mr. Mullis based on the May 9, 2006 inspection. (Doc. 119, Ex. 42 at 6.) He calculated a cost of $280,232.77 to repair the damage regarding the July 25, 2005 lightning strike claim. (*Id.*) This did not include deductions for depreciation, deterioration, or obsolescence, or for the $10,000.00 policy deductible. (*Id.*)

Mr. Whitley, on May 25, 2006, submitted a report based on the May 9, 2006 inspection. (Doc. 119, Ex. 35 at 6 ¶ 5.) With respect to the damage to the east/rear wall, Mr. Whitley concluded that " . . .with the first date . . . being over two years prior to the inspection by [Mr. Whitley], and with the evidence having been disturbed, an adequate investigation into the cause of the damage is not possible."[4] (Doc. 119, Ex. 43 at 12, ¶ C. 1.)

---

[4] Damage to the east/rear wall first occurred on February 5, 2004, over two years prior to Mr. Whitley's May 9, 2006 inspection. (Doc. 119, Ex. 1 at 1, ¶ 3; Doc. 119, Ex. 35 at 6, ¶ 5.)

_____On June 15, 2006 and July 18, 2006, Mr. Mullis again met with Mr. Stephens to discuss resolution of the claims.  (Doc. 119, Ex. 38 at 3.)  At the July 18, 2006 meeting, Mr. Mullis, with U.S. Fire's permission, offered $92,383.63 for the east/rear wall February 5, 2004 wind loss claim.  He also offered $270,232.77 for the east/rear wall July 25, 2005 lightning strike claim.  (Doc. 119 at Ex. 44; Doc. 119 at Ex. 45.)  The offers Mr. Mullis made in July 2006 were compromise offers, calculated using RCV, with no deduction for depreciation, deterioration, or obsolescence, even though Stephens Wholesale had not made any repairs or replacement and was entitled only to ACV, not RCV. (Doc. 119 at Ex. 44.)  Alternatively, Mr. Mullis presented U.S. Fire's offer to resolve all storm damage claims regarding the Beaunit Building for $515,456.94.  (*Id.*) This figure constituted payment of all unresolved claims including the February 5, 2004 wind loss claim, the July 25, 2005 lightning strike claim, as well as the Hurricane Ivan damage claims.  (*Id.*)  Additionally, Mr. Mullis presented U.S. Fire's offer to pay the Hurricane Ivan claims and the July 25, 2005 lightning strike claim for ACV and leave unresolved the February 5, 2004 wind loss claim on which Stephens Wholesale originally brought suit.  (*Id.*)

On August 8, 2006, Mr. Stephens notified Mr. Mullis that he would settle all claims except the February 5, 2004 wind loss claim, for $640,000.  (Doc. 119 at Ex. 47.) Mr Mullis responded by reminding Mr. Stephens that the current ACV estimates for all damages totaled approximately $365,000, though he later acknowledged that if $14.00

clay blocks were used in the estimates, the estimates would triple in amount.  (Doc. 118, Ex. 30 at 201.)  Mr. Mullis agreed to pass the figure requested by Mr. Stephens on to U.S. Fire.  (Doc. 119 at Ex. 47.)  U.S. Fire and Mr. Stephens did not reach an agreement regarding these offers and negotiations ceased.  (Doc. 118, Ex. 30, at 87 at ll. 8-19.)

On September 11, 2006, U.S. Fire filed its petition for declaratory judgment with respect to all claims made by Stephens Wholesale for storm damage to the Beaunit Building.  (Doc. 15.)

On February 27, 2007, Stephens Wholesale filed its third amendment to the complaint alleging breach of contract and bad faith against U.S. Fire arising out of the July 25, 2005 lightning strike claim.  (Doc. 24 at 2, ¶ 5, 3, ¶ 6.)  Stephens Wholesale's third amendment to the complaint also alleges as additional damage loss rents and the inability to secure replacement insurance except at larger premiums.  (*Id.* at 2, ¶ 5.)  U.S. Fire claims that there is no indication from the record, however, that Stephens Wholesale leased portions of the Beaunit Building or that any loss of rent resulted from such damage.  (Doc. 113 at 15, ¶ 68.)  It further notes that Stephens Wholesale's counsel stated on the record that damages for increased insurance premiums were no longer being sought.  (Doc. 111, Ex. 29 at 86, ll. 19-23, 87, ll. 1-3.)  Stephens Wholesale disputes these statements and notes that Mr. Stephens testified to the loss of rents and the inability to rent because of the damage.  (Doc. 117 at 2, ¶ 68; Doc. 118, Ex. 28 at 117-18.)  Mr.

Stephens also testified that he has incurred increased deductibles in his replacement insurance.  (Doc. 118, Ex. 28 at 223, 225; Doc. 111, Ex. 29 at 87.)

On June 27, 2007, Ms. Michele Best, a property claims specialist with U.S. Fire, gave a deposition regarding the claims made by Stephens Wholesale.  (Doc. 118 at Ex. 29.)  She stated that the February 4, 2005 wind loss claim and the July 25, 2005 lightning strike claim were "covered losses" under the policy.  (*Id.* at 107.)  She further testified that the policy required U.S. Fire to make Stephens Wholesale whole when there is a covered loss.  (*Id.* at 96, 203.)  She stated that U.S. Fire "owes money" on the two claims, and that the only unresolved issues were scope (the method of repair) and damages (cost to repair).  (*Id.* at 107, 208.)

5.     <u>Prior Litigation Regarding a Collapse of the Same East/Rear Wall of the Beaunit Building</u>

U.S. Fire stresses that this case is not the first litigation involving a collapse of the same east/rear wall of the Beaunit Building.  In 1990, Stephens Wholesale reported similar wind damage at the Beaunit Building to the carrier, GAB Business Services, Inc. ("GAB") (Doc. 119, Ex. 50, Ex. A at 1, ¶ 2.)  GAB retained the services of an engineer, Mr. Leonard Quick, who inspected the damage on May 31, 1990.  (*Id.*)  Mr. Quick's report identified the collapsed wall as "[a] section of the east wall of the larger building, which consists mainly of fired clay brick and partially of corrugated metal siding. . . ." (*Id.* at 2, ¶ 2.)  U.S. Fire also emphasizes that following the wall collapse, Stephens

Wholesale's expert from Alex Sill warned that "in order to insure structural stability, the entire wall including brick must be replaced."  (Doc. 119, Ex. 53 at 1 ¶ 4.)

In 1991, Stephens Wholesale filed suit against Pennsylvania Lumber Mutual Insurance Company in this court for wind damage to the Beaunit Building.  (Doc. 119, Ex. 51 at 1, ¶ 1.)[5]  Pennsylvania Lumber ultimately paid out $414,093.13 for damage to the east/rear wall in 1992.  (Doc. 119, Ex. 52.)

Mr. Quick, who had inspected the east/rear wall in 1990, returned to the property on July 10, 2007.  In 2007, Mr. Quick found:

> In July 2007, I observed the east/rear wall again.  The repairs and remedial measures that I recommended in 1990 had not been made.  The leaning southeast corner of the east/rear wall had not been repaired, and the outer wall at the southeast corner had fallen. . . .
>
> In 2007, the 50 foot section of brick that was missing in 1990 still had not been repaired.  The area of missing brick I observed in 1990 still begins and ends at the identical points along the top of the wall and still travels the same 50 feet . . . the configuration of the missing bricks at the top of the wall is still the same as in 1990.

(Doc. 119, Ex. 50 at 3, ¶¶ 1-2.)


6.   Facts Relating to the Hurricane Ivan claims of September 20, 2004 and February 7, 2006

On September 20, 2004, Mr. Stephens presented a claim to U.S. Fire for damage to the Beaunit Building that allegedly occurred as a result of Hurricane Ivan on September 16, 2004.  (Doc. 111 at Ex. 1.)  Only paragraphs 5 and 6 of Stephens Wholesale's third

---

[5] *Stephens Wholesale Bldg. Supply Co. v. Pa. Lumber Mut. Ins. Co.*, No. 2:91-cv-1465-ELN (N.D. Ala. Nov. 23, 1993).

amended complaint could possibly incorporate legal claims arising as a result of the insurance claims made regarding Hurricane Ivan.  (Doc. 24 at ¶¶ 5-6.)  The other paragraphs of the complaint concern only the "initial" losses described as occurring on February 5, 2004, the wind loss claim to the east/rear wall.  (*Id.* at ¶¶ 1-4.)

On September 22, 2004, U.S. Fire assigned the Hurricane Ivan claim to Mike Mullis, an independent insurance adjuster employed by Vericlaim, Inc.  (Doc. 111, Ex. 2 at 2, ¶ 2.)  On September 23, 2004, three days after Stephens Wholesale made its claim, Mr. Mullis began to call Mr. Charles Stephens in order to schedule an inspection of the property.  (*Id.* at 3, ¶ 2.)  Mr. Mullis and other Vericlaim adjusters made a total of nine calls to Mr. Stephens between September 23, 2004, and March 4, 2005, a period of about five and a half months; all of these calls went unanswered.  (Doc. 111, Ex. 21 at 1.)

Mr. Stephens first contacted Mr. Mullis on March 4, 2005, to inform him that he had already retained the public adjusting firm of Alex Sill to inspect the property damage allegedly caused by Hurricane Ivan.  (Doc. 111, Ex. 2 at 3-4, ¶ 5; Doc. 111, Ex. 3 at 1, ¶ 2.)  Mr. Stephens also suggested that Mr. Mullis delay determining whether there was any dispute as to damages until Mr. Mullis received the damage estimates that Alex Sill was preparing for Stephens Wholesale.  (Doc. 111, Ex. 3 at 1, ¶ 2.)  In response, Mr. Mullis told Mr. Stephens that he, Mullis, could not forego inspection of the property damage. (*Id.*)  Mr. Stephens then instructed Mr. Mullis to communicate directly with Alex Sill to schedule an inspection of the property damage presumably caused by Hurricane Ivan. (*Id.*; Doc. 111, Ex. 2 at 3-4, ¶ 5.)

a.    *Facts Concerning the West Wall and Corners, and the North and South Walls*

On March 7, 2005, two days after his conversation with Mr. Stephens, Mr. Mullis

first spoke with Mr. Michael Werner, an adjuster with Alex Sill, to arrange an inspection

of the property.  (Doc. 111, Ex. 2 at 4, ¶ 1.)  On that date Mr. Werner advised Mr. Mullis

that conflicts in Werner's schedule would not permit him to accompany Mr. Mullis before

April 6, 2005.  (*Id.*)  An inspection date was then set for April 6, 2005.  (*Id.*)  Before the

scheduled inspection, Alex Sill presented Mr. Mullis with a damage estimate, dated

February 3, 2005, for Hurricane Ivan damage to the Beaunit building in the amount of

$142,128.71.  (Doc. 111, Ex. 5 at 5.)  The February 3, 2005, estimate from Alex Sill

stated that Alex Sill conducted an inspection of the Hurricane Ivan property on December

2, 2004.  (*Id.* at 1.)

On May 25, 2005, Alex Sill prepared a revised estimate for claimed Hurricane

Ivan damage to the Beaunit building in the amount of $113,074.57.  (Doc. 111, Ex. 7 at

7.)  This estimate, as did the previous estimate provided by Alex Sill, concerned damage

to the west wall and corners, as well as the north and south walls.  (*Id.*)

On April, 6, 2005, nearly seven months after Hurricane Ivan, Mr. Mullis was first

permitted to visit the property to inspect for property damage.  (Doc. 111, Ex. 2 at 4, ¶ 2.)

Alex Sill adjusters, Mr. Werner and Mr. Keith Brenneman, also attended.  (*Id.*)  During

the April 6, 2005, inspection, Mr. Werner and Mr. Brenneman pointed out to Mr. Mullis

the areas where it was claimed that Hurricane Ivan caused property damage.  (*Id.*)  The

locations identified by the Alex Sill adjusters were parts of a building incorporated into

the Beaunit building on its west side, referred to as the "front building."  (*Id.*)

Specifically, the Alex Sill adjusters pointed out property damage to the west wall and

corners, as well as the north and south walls of the front building.  (*Id.*)

Mr. Mullis inspected the areas of claimed damage, finding separation of cement

mortar in a "step pattern" indicative of long term settling, but also noting damage to metal

siding on the front building.  (Doc. 111, Ex. 6 at 2, ¶ 4.)  During the inspection, Mr.

Mullis informed Stephens Wholesale's public adjusters, Mr. Werner and Mr. Brenneman,

that he could not agree that damage to the west wall and the corners of that wall were

covered by Hurricane Ivan unless it was confirmed by an engineer that this damage was

wind damage as opposed to long term settling damage.  (Doc. 111, Ex. 2 at 4, ¶ 3.)

Mr. Mullis could not, however, rule out the possibility that wind could have

contributed to the damage on the north and south walls of the front building, so he

prepared an estimate for that damage alone.  (*Id.* at ¶ 2.)  Mr. Mullis's estimate of the

possible property damage to the north and south walls of the front building caused by

wind damage from Hurricane Ivan, dated July 24, 2005, was for $9,036.88.  (Doc. 111,

Ex. 27 at 2.)  On August 5, 2005, with U.S. Fire's approval, Mr. Mullis made an offer in

the amount of $9,036.88 for the damage that he thought might be wind damage to the

north and south walls of the front building.  (Doc. 111, Ex. 2 at 5, ¶ 1.)  On September 9,

2005, Stephens Wholesale accepted this offer.  (*Id.*)  Subsequently, on September 9, 2005,

Mr. Stephens signed a Sworn Proof of Loss statement, which included the $9,036.88

estimate for damage to the front building. (*Id.*; Doc. 111 at Ex. 8.) U.S. Fire paid that amount as part of a larger claim.[6] (Doc. 111 at Ex. 8.)

Still, however, the issue of the damage to the west wall and corners remained open. Because Mr. Mullis had told Stephens Wholesale that he needed confirmation from an engineer that wind caused this damage, Mr. Stephens had an engineer review the damage on August 4, 2005. (Doc. 111, Ex. 10 at 2.) In a report issued on that date, Stephens Wholesale's engineer, Mr. Gregory Tucker of Tucker Jones Engineers Associated, P.C., concluded that the localized winds were the probable cause of the cracks in the corners of the west wall and corners of the front building. (*Id.* at 3, ¶ 3.) The report also concluded that the roof structure of the acid building was severely damaged and partially collapsed. (*Id.* at ¶ 1.) The report could not attribute any particular portion of that damage to Ivan: "The acid building roof structure is severely damaged and has partially collapsed. It is unknown the extent of this damage that occurred due to the September 16, 2004 [Ivan] storm." (*Id.*)

Stephens Wholesale, though, waited four months, until December 12, 2005, to inform Mr. Mullis of this inspection and report. (Doc. 111, Ex. 11 at 1, ¶ 3.) Mr. Mullis received a copy of the report in late December 2005. Relying on the information in that report, on February 2, 2006, Mr. Mullis prepared an estimate for damage to the west wall of the front building and its corners, pursuant to the ACV provisions of the policy, in the

---

[6] U.S. Fire's total payment to Stephens Wholesale on September 9, 2005, $395,318.18, included payments for claims regarding eighteen different properties that were damaged by Hurricanes Katrina, Dennis, and Ivan. (*See* Doc. 111 at Ex. 8; Doc. 119, Ex. 35, at 2, ¶ 2.)

amount of $34,531.54, and presented it to Stephens Wholesale.  (Doc. 111, Ex. 12 at 2;

Doc. 111, Ex. 2 at 5, ¶ 2.)


b.     *Facts Concerning the "Crane Bay Building" and the "Acid Building"*

On February 7, 2006, Mr. Mullis inspected the Beaunit Building regarding claims

from Hurricane Ivan and the July 25, 2005 lightning strike, along with the areas addressed

in Mr. Tucker's report.  (Doc. 111, Ex. 2 at 5, ¶ 3; Doc. 111, Ex. 26 at 2.)  This inspection

was conducted at parts of the building other than those purportedly damaged by Hurricane

Ivan.  (Doc. 111, Ex. 2 at 5, ¶ 3.)

During the February 7, 2006 inspection, Mr. Mullis was informed for the first time

that further claims for property damage from Hurricane Ivan were being made.  These

new claims were for areas of the Beaunit Building called the "crane bay building" and the

"acid building."  This was nearly seventeen months after Hurricane Ivan.  (*Id.*; Doc. 111,

Ex. 17 at 2, ¶ 3.)

Also on February 7, 2006, Mr. Stephens gave Mr. Mullis a demolition estimate for

the acid building.  It was prepared for Stephens Wholesale by G&B Enterprises, Inc. on

February 3, 2006.  (Doc. 111, Ex. 2 at 5, ¶ 3.)  The February 3, 2006, demolition estimate

from G&B Enterprises, Inc. made no findings regarding the cause of the damage.  It

recommended, though, that the acid building be demolished because "[t]he roof damage

has allowed water to get into the building and subsequently deteriorated the building into

a state that is beyond repair."  (Doc. 111, Ex. 15 at 1, ¶ 1.)

On February 7, 2006, Mr. Stephens requested that U.S. Fire pay for the demolition of the acid building.  (Doc. 111, Ex. 2 at 6, ¶ 1.)  Mr. Mullis told Mr. Stephens that he did not think coverage for demolition was provided.  (*Id.*)  On February 7, 2006, Mr. Stephens told Mr. Mullis that Stephens Wholesale rarely used the acid building because it had deteriorated significantly.  (*Id.*)

After the February 7, 2006, inspection, Mr. Mullis sought permission from Stephens Wholesale to allow a structural engineer and building consultant to inspect the newly claimed property damage to the crane bay building and acid building, which Mr. Stephens claimed was the result of Hurricane Ivan in September 2004.  (*Id.* at ¶ 2.)  Then, on April 7, 2006, Mr. Mullis met with Mr. Stephens.  (*Id.* at 9, ¶ 2.)  At this meeting, Mr. Stephens asked for $1,300,000 to settle all outstanding claims, including the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim.  (*Id.*)

On May 1, 2006, Mr. Stephens agreed to allow Mr. Mullis to bring a structural engineer and building consultant to the property to inspect the property damage that was allegedly caused by Hurricane Ivan.  (*Id.* at 6, ¶ 4.)  An inspection date was arranged with Alex Sill.  (*Id.*)  The first available inspection date for Alex Sill was May 9, 2006.  (*Id.*)

On May 9, 2006, Mr. Charles Whitley, the structural engineer with Engineering, Design & Testing, and Mr. Chris Witcher, the building consultant with the firm of Belfor U.S.A. Group, Inc., attended an inspection with Mr. Mullis, Stephens Wholesale's adjusters, Mr. Brenneman and Mr. Werner, and Stephens Wholesale's engineer, Mr. Greg Tucker.  (*Id.* at ¶¶ 4-5.)  Mr. Mullis, Mr. Whitley, and Mr. Witcher inspected all areas of

alleged Hurricane Ivan damage that was pointed out by Stephens Wholesale's public adjusters.  (*Id.* at ¶ 5.)  Mr. Mullis, Mr. Whitley, and Mr. Witcher also went on the roof of the acid building to inspect.  (*Id.*)  U.S. Fire alleges that Mr. Brenneman, Mr. Werner, and Mr. Tucker refused to go on the roof because of the roof's deterioration.  (*Id.*; Doc. 113 at ¶ 38.)  Stephens Wholesale, however, notes that Mr. Brenneman testified that he got on the roof three times.  (Doc. 117 at 2, ¶ 38; Doc. 118, Ex. 31 at 58.)  U.S. Fire also alleges that it is undisputed that the roof of the acid building showed indications of decay and deterioration.  (Doc. 111 at Ex. 16.)  Stephens Wholesale, in response, states that Mr. Werner testified there was not any excessive wear, tear, deterioration or obsolescence with the roof and that it was in good shape.  (Doc. 117 at 2, ¶ 38; Doc. 118, Ex. 32 at 225.)

On May 9, 2006, Stephens Wholesale's experts agreed that if Mr. Mullis, Mr. Whitley and Mr. Witcher were correct about severe rotting on the roof of the acid building, it could not have been caused by Hurricane Ivan.  (Doc. 111, Ex. 2 at 6, ¶ 5.)  As of August 22, 2007, no repair or replacement had been performed to any of the property damage that was claimed to have been caused by Hurricane Ivan.  (Doc. 80 at 4.)  U.S. Fire has received no subsequent information indicating that any repair or replacement has been performed.

7.     U.S. Fire and Stephens Wholesale Continue Attempts to Settle the Hurricane Ivan
       claims of September 20, 2004 and February 7, 2006

Based on the May 9, 2006, inspection, Mr. Whitley concluded that the west wall of

the front building sustained long-term damage, which occurred long before Hurricane

Ivan, but that wind pressures from Hurricane Ivan could have "contributed" to property

damage near the canopy braces on the west wall.  (Doc. 111, Ex. 16, at 12, ¶ 1; Doc. 111,

Ex. 17 at 4, ¶ 1, 5 ¶ 2.)  Based on that same inspection, he also concluded that the roof of

the acid building sustained long-term damage that occurred before Hurricane Ivan, but

that wind pressures could have enlarged the openings in the roof.  He also found that the

covers for the openings in the roof were in such poor condition that they would not have

protected the opening with or without wind damage.  (Doc. 111, Ex. 17 at 3, ¶ 2, 5, ¶ 3.)

On May 10, 2006, the day after Mr. Whitley rendered his opinion, only nine days

after Mr. Stephens agreed to allow an inspection, and only three days after the inspection,

Mr. Mullis prepared another ACV estimate with respect to the Hurricane Ivan claim.[7]

(Doc. 111, Ex. 2 at 7, ¶ 1; Doc. 111 at Ex. 18.)  It included the corners of the front/west

wall of the front building, the west wall and roof of the acid building, and the east wall of

the crane bay building.  (Doc. 111, Ex. 2 at 7 ¶ 1; Doc. 111 at Ex. 18.)  Mr. Mullis's May

---

[7] Initially, Mr. Stephens wanted Mr. Mullis to inspect the damage to the crane bay
building and acid building without Mr. Mullis's other experts.  (Doc. 111, Ex. 2 at 6, ¶ 3.)
Instead, Mr. Stephens wanted the inspection to include only himself,  his public adjusters from
Alex Sill, and Mr. Mullis.  (*Id.*)  On May 1, 2006, however, Mr. Stephens agreed to allow Mr.
Mullis to bring a structural engineer and a building consultant.  (*Id.* at ¶ 4.)   The inspection was
set for May 9, 2006.  (*Id.*)

10, 2006 ACV estimate for the damaged areas, taking into account deterioration, depreciation, and obsolescence, was $108,231.19.  (Doc. 111, Ex. 2 at 7, ¶ 1.)

On May 25, 2006, Mr. Whitley prepared an inspection report based on his May 9, 2006, inspection.  (Doc. 111 at Ex. 16.)  Based on that inspection of the crane bay building, he concluded that the damage to the brick along the east wall of the crane bay building was caused by "absorption of a salt solution into the brick, most likely from past production operations at the plant," and not from storm damage.  (*Id.* at 9-10, ¶ 10, 10, ¶ 11; Doc. 111, Ex. 17 at 3-4, ¶ 3.)  Mr. Whitley was certain that the deterioration and decay of these areas were not caused by Hurricane Ivan.  (Doc. 111, Ex. 16 at 12, ¶ 1; Doc. 111, Ex. 17 at 3-4, ¶ 3.)  Stephens Wholesale disputes Mr. Whitley's report and claims that the east wall was a good functioning wall.  (Doc. 117 at 2, ¶ 48.)  Specifically, Stephens Wholesale stresses that Mr. Brenneman testified that the wall was "decent looking."  (Doc. 118, Ex. 31 at 112.)

Based on his May 25, 2006 inspection, Mr. Whitley also determined that "[t]he bowing of the west wall of the acid building is long term in nature and not the result of any recent event."  (Doc. 111, Ex. 16 at 12, ¶ 1; Doc. 111, Ex. 17 at 3, ¶ 1.)

Finally, Mr. Whitley reported that his inspection was made difficult by the time distance of almost twenty months:

> By May 9, 2006, almost twenty months had passed since Hurricane Ivan on September 16, 2004.  By that time, it was impossible to determine whether the wind from Hurricane Ivan might have contributed to the damage to the west wall of the paper storage building, the crane bay or the acid building.  However, it was clear from my inspection on May 9, 2006, that the damage I observed was not the result of high winds. . . .  Again, it was impossible on May 9, 2006, to determine

if the winds of Hurricane Ivan contributed to the damage, but it was clear that the deterioration and decay I saw was not caused by a storm or wind in September 2004.

(Doc. 111, Ex. 17 at 4, ¶ 1.)

On May 15, 2006, based on his May 9, 2006, inspection, Mr. Witcher prepared estimates to repair the claimed damage.  (Doc. 111 at Ex. 19.)  On receipt of the repair estimate from Mr. Witcher, Mr. Mullis separated the estimates into two categories: damages "probably caused by Hurricane Ivan" and damages "probably not caused by Hurricane Ivan."  This categorization was based on the findings of Mr. Whitley.  (Doc. 111, Ex. 20 at 2.)

Considering Mr. Whitley's professional opinion, along with the repair estimate of Mr. Witcher, Mr. Mullis estimated that the "probably covered loss" to the west wall and corners of the front building had an estimated RCV of $72,162.83.  (*Id.*)  The areas of loss, as determined by Mr. Whitley, that were "probably not caused by Hurricane Ivan," in the crane bay building area and acid building collectively, had a RCV of $322,710.82.  (*Id.*)  Mr. Mullis's estimate is dated June 15, 2006.  It was calculated using RCV, which did not include deductions for deterioration, depreciation, or obsolescence.  Therefore, it was a larger figure than the ACV, which is allowed under the terms of the policy where property damage has not been repaired or replaced.  (*Id.*; Doc. 80 at 6, ¶ 1.)

During preliminary discussions with Mr. Stephens about the estimates prepared by Mr. Witcher, Mr. Stephens disputed causation of the damage to the crane bay and acid building areas.  (Doc. 111, Ex. 20 at 2.)  Mr. Stephens said that neither he nor the

property manager noticed damage in those areas prior to Hurricane Ivan.  (*Id.*)  None of

Stephens Wholesale's expert reports directly attribute the damage to the crane bay

building or acid building walls to Hurricane Ivan.  One report, though, stated that the

extent Hurricane Ivan may have contributed to the roof damage of the acid building was

"unknown."  (Doc. 111, Ex. 10 at 3, ¶ 1.)

In June 2006, Mr. Stephens asked for $480,000 to settle all Hurricane Ivan claims.

(Doc. 111, Ex. 20 at 2.)  Ms. Michele Best, the property claims specialist with U.S. Fire,

did not deny coverage in July of 2006 for damage to the areas of the crane bay and acid

buildings that Mr. Whitley determined might not have been caused by Hurricane Ivan.

(Doc. 111 at Ex. 21.)  Instead, she separated U.S. Fire's next offer into two categories, as

Mr. Mullis had done.  (*Id.*; Doc. 111, Ex. 22 at 218, ll. 22-23, 219, ll. 1-11.)

On July 18, 2006, Ms. Best, through Mr. Mullis, made an offer to pay full RCV for

the areas of damage categorized by Mr. Mullis, based on the report of Mr. Whitley, as

"probably covered" loss (west wall and corners of the front building), and on the areas of

damage categorized by Mr. Mullis as "questionable covered causes of Loss" (the crane

bay building and acid building).  (Doc. 111 at Ex. 21; Doc. 111 at Ex. 23.)  Her

compromise offer to settle the "probably not covered" areas of damage was calculated at

twenty-five percent of the RCV.  (Doc. 111 at Ex. 21.)  Ms. Best's compromise offer

totaled $152,840.54.  (*Id.*)  On July 18, 2006, Mr. Mullis offered Mr. Stephens

$152,840.54 to settle all claims for Hurricane Ivan damage.  (*Id.*; Doc. 111 at Ex. 23.)

The parties also agree that, at this time, alternatively, U.S. Fire made a compromise offer

to settle any and all remaining storm damage claims on the Beaunit building for a total of $515,456.94, subject to the execution of a full release. (Doc. 111 at Ex. 21.) This included the Hurricane Ivan claims, as well as the February 5, 2004 wind loss claim and the July 25, 2005 lighting strike claim. (Doc. 111, Ex. 22 at 99, ll. 3-14, 98, ll. 1-2; Doc. 111 at Ex. 23.) U.S. Fire also offered to settle the Hurricane Ivan and July 25, 2005 lightning strike claims on an ACV basis separately, if Mr. Stephens was unwilling to settle the February 5, 2004 wind loss claim that was already in litigation. (Doc. 111, Ex. 22 at 97, ll. 20-23, 100, ll. 1-2; Doc. 111 at Ex. 23.) On August 8, 2006, Mr. Stephens countered by asking that U.S. Fire settle all claims except the February 5, 2004 wind loss claim, that was already in litigation, for $685,000. (Doc. 111 at Ex. 24.) It is unknown how much of that amount represents the Hurricane Ivan claims.

On August 13, 2006, Stephens Wholesale's public adjusters prepared a revised estimate for Hurricane Ivan damage in the amount of $253,874.32. (Doc. 111, Ex. 25 at 9.) This August 13, 2006 estimate did not take into account deductions for deterioration, depreciation, and obsolescence as required by the policy. (*Id.*) Mr. Stephens did not accept the $152,840.54 offer for claimed Hurricane Ivan damage or the $515,456.94 offer for all claimed damage to the Beaunit building. (Doc. 111 at Ex. 24.) Accordingly, it seems that the final offers for the Hurricane Ivan damages were $152,840.54 from U.S. Fire, and $253,874.32 from Mr. Stephens.

On June 27, 2007, Ms. Best testified that the Hurricane Ivan loss was a "covered loss" under the policy. (Doc. 118, Ex. 29 at 107.) She further testified that the policy

required U.S. Fire to make Stephens Wholesale whole when there is a covered loss.  (*Id.* at 96, 203.)  She stated that U.S. Fire "owes money" on the Hurricane Ivan claims, and the only unresolved issues were scope and damages.  (*Id.* at 107, 208.)

### III.  DISCUSSION

Stephens Wholesale claims that U.S. Fire breached the contract for insurance by failing and refusing to pay for the three claimed losses.  (Doc. 24 at ¶¶ 2, 5.)  It also claims that U.S. Fire acted in bad faith in handling the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim.  (*Id.* at ¶¶ 4, 6.)  U.S. Fire now seeks a declaratory judgment or final summary judgment in its favor with respect to all matters pertaining to the property damage claims brought by Stephens Wholesale regarding the Beaunit Building.  (*See* Doc. 112; Doc. 121; Doc. 123.)

### A.____U.S. FIRE'S MOTION FOR SUMMARY JUDGMENT REGARDING THE BREACH OF CONTRACT CLAIMS

To establish a breach of contract claim under Alabama law, a plaintiff must show "'(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d , 293, 303 (Ala. 1999) (citing S. Med. Health Sys., Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995)).

1. The February 5, 2004 Wind Loss Claim and the July 25, 2005 Lightning Strike Claim Regarding the East/Rear Wall of the Beaunit Building (Doc. 123)

 U.S. Fire claims that summary judgment is due in its favor regarding the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim because Stephens Wholesale failed to perform under the contract, the second element required of a breach of contract claim.  It filed its "Motion for Final Declaratory Relief and/or Final Summary Judgment" on October 3, 2008 (Doc. 123), along with a brief in support (Doc. 120). Thereafter, Stephens Wholesale filed its "Brief in Opposition to Defendant's Motion for Final Declaratory Relief and/or Final Summary Judgment" (Doc. 129).  Following that response, U.S. Fire filed a "Brief in Reply to Plaintiffs' Opposition" (Doc. 133).

a. *U.S. Fire's Argument that Stephens Wholesale Failed to Mitigate Damages*

 Initially, U.S. Fire argues that despite the express provision of the policy, which required Stephens Wholesale to, "in the event of loss or damage to [the Beaunit Building] . . . [t]ake all reasonable steps to protect the [Beaunit Building] from further damage," Stephens Wholesale failed to mitigate damages after a loss, thereby precluding coverage for subsequent damages to the property.  (Doc. 111, Ex. 28 at 9 § 3a(4).)

 Under Alabama law, "all parties who seek recompense from another [have] a duty to mitigate their losses or damages."  *AVCO Fin. Servs. Inc. v. Ramsey*, 631 So. 2d 940, 943 (Ala. 1994) (citing Aetna Life Insurance Co. v. Lavoie, 470 So. 2d 1060 (Ala. 1984)). Thus, "a plaintiff can recover only for that damage or loss that would have been sustained

if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss." *Id.* (citing Equilease Corp. v. McKinney, 289 So. 2d 809 (Ala. Ct. App. 1974)).

If it is undisputed that an insured failed to mitigate damages after a loss, as required by the insured's policy, the failure constitutes a violation of the conditions of the policy and operates to void coverage for the avoidable subsequent damages as a matter of law.[8]  *See Slade*, 747 So. 2d at 321-22 (citing Real Asset management, Inc. v. Lloyd's of London, 61 F.3d 1223, 1230 (5th Cir. 1995) (holding that the insured's duty to mitigate does not terminate when the insurer breaches a duty to timely settle a claim)).  In *State Farm Fire & Casualty Co. v. Slade*, the Alabama Supreme Court considered language similar to the instant policy in determining whether the homeowners' failure to mitigate damages voided coverage for subsequent damages under the policy.  *Id.*  Specifically, the policy required the homeowners to "protect the property from further damage or loss, [and to] make reasonable and necessary temporary repairs required to protect the

---

[8] Stephens Wholesale argues that whether or not a party has mitigated damages is a question of fact for the jury. (Doc. 129 at 7.)  Indeed, under Alabama law, when the parties' proffered evidence "substantially supports conflicting reasonable inferences" as to whether the insured complied with the duty to mitigate damages, the issue is a factual question for the jury. *Ramsey*, 631 So. 2d at 943.  In the instant case, however, the evidence offered by U.S. Fire shows that it is undisputed that Stephens Wholesale did not mitigate damages regarding the east/rear wall.  (*See* Doc. 80 at 4, ¶ 1, 5, ¶ 1; Doc. 83.)  The evidence does not, however, address whether or not Stephens Wholesale's failure to mitigate damages actually caused the subsequently claimed damages, and to what extent.  (*See id.*)  Therefore, to what extent the failure to mitigate actually caused subsequently claimed damages is not undisputed.  *Cf. Kuruvilla v. Red Bay Hosp.*, 497 So. 2d 829, 831 (Ala. Civ. App. 1986) (noting that a "plaintiff cannot recover for any loss *to the extent* that the loss was increased by his failure to reasonably act") (emphasis added). Nevertheless, because the court finds that a genuine issue of material fact exists as to whether Stephens Wholesale was financially able to mitigate damages, the issue is moot.

property." *Id.* at 321.  The homeowners "knew that the cracking in their home was worsening, but failed to take any action." *Id.*  The court therefore noted that "any increased damage to the [homeowners'] home was caused by their own failure to act and not by [the insurance company's] conduct." *Id.*  The court then held that "the policy clearly placed on the [homeowners] the burden to prevent further loss, and they cannot now hold their insurer liable for something they were required to do." *Id.*

When an insured is financially unable to mitigate damages as required by an insurance policy, the duty to mitigate does not apply.  *See Ramsey*, 631 So. 2d at 942-43; *Carnival Cruise Lines, Inc. v. Goodin*, 535 So. 2d 98, 103 (Ala. 1988) (holding that the duty to mitigate does not apply where it "would impose upon the injured party undue risk, expense, humiliation, or indignity").  In *Ramsey*, a financial services company filed suit against its attorney who failed to discover a first mortgage in a title search.  631 So. 2d at 941-42.  The attorney claimed that the financial services company failed to mitigate its damages.  *Id.* at 942.  The court disagreed, noting that mitigation would have required the company to take unreasonable and expensive procedural steps including removing a stay order of the bankruptcy court, which prevented the company from foreclosing on its second mortgage.  *Id.* at 942-43.  The court held that the rule of mitigation "does not apply where the injured party, in an effort to minimize the loss, would be required to incur considerable personal risk or expense with but a slight chance of an alternative recovery." *Id.*

Pursuant to the insurance policy between the parties, Stephens Wholesale was required to "(4) [t]ake all reasonable steps to protect the [Beaunit Building] from further damage." (Doc. 111, Ex. 28 at 9 § 3a(4).)  It is further undisputed, as in *Slade*, that Stephens Wholesale did not mitigate damages following the February 5, 2004 wind loss claim.  (*See* Doc. 80 at 4, ¶ 1, 5, ¶ 1; Doc. 83.)  U.S. Fire therefore argues that Stephens Wholesale, like the homeowners in *Slade*, cannot, as a matter of law, recover for any subsequent damages, such as the July 25, 2005 lightning strike damages, or at a minimum, damages regarding loss rents and higher deductibles.  (*See* Doc. 123 at 3, ¶ 4; Doc. 120 at 26.)  Similar to the company's argument in *Ramsey*, Stephens Wholesale claims the damage to the Beaunit Building was so extensive that it was financially unable to fix it, and points to the deposition of Mr. Charles Stephens as support.  (*See* Doc. 117 at 10, ¶ 17; Doc. 149, at 242-43.)  The cited evidence, however, reveals that Mr. Stephens was discussing the Hurricane Ivan claims and responding to why he had not replaced the roof to the acid building.  (*See* Doc. 149 at 242-43.)  Nevertheless, in Mr. Stephens's response to U.S. Fire's Request for Admission, asking Mr. Stephens to "[a]dmit that [he had] not repaired or replaced the 'rear' or 'east' wall of the Beaunit building that is made the subject of this lawsuit since February 5, 2004," Mr. Stephens responded by admitting to the statement, noting that he was "[u]nable to do so."  (Doc. 80 at 4.)  So, as in *Ramsey*, because Stephens Wholesale claims it was financially unable to mitigate damages, and because evidence favoring Stephens Wholesale, the non-moving party, is to be believed and all reasonable inferences drawn in its favor, a genuine issue of material fact exists

37

regarding Stephens Wholesale's duty to mitigate.[9]  Therefore, U.S. Fire's Motion for Summary Judgment regarding Stephens Wholesale's east/rear wall claims, on the ground that Stephens Wholesale failed to mitigate damages, is due to be denied.

b.      *U.S. Fire's Argument that Stephens Wholesale Made Performance Impossible*

U.S. Fire argues that summary judgment is due in its favor on the east/rear wall claims because Stephens Wholesale made performance by U.S. Fire impossible because Mr. Stephens refused to accept U.S. Fire's east/rear wall settlement offers.

Under Alabama law, "fundamental justice" requires "that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." *World's Exposition Shows v. B.P.O. Elks, No. 148*, 186 So. 721, 724 (Ala. 1939) (quoting 3 Williston on Contracts § 677 (rev. ed. 1936)); *see also Tiller v. YW Housing Partners, Ltd.*, 5 So. 3d 623, 629-630 (holding summary judgment improper where parties' proffered evidence showed disagreement whether performance by one party was made impossible by other party).  In *Lovoy v. Ratliff*, the court considered whether an

---

[9] U.S. Fire also argues that following the 1991 litigation against Pennsylvania Lumber Mutual Insurance Company, Stephens Wholesale received $414,093.13 for damage to the east/rear wall.  *See supra* Part II.B.5.  It further notes that despite warnings from Stephens Wholesale's own experts, Mr. Stephens did not use the money for repair of the east/rear wall. U.S. Fire therefore reasons that Stephens Wholesale cannot recover any damages regarding the east/rear wall, including the February 5, 2004 wind loss damages, because of its failure to mitigate.  But, whether or not Stephens Wholesale was financially able to repair the east/rear wall in 1992 is irrelevant; U.S. Fire freely chose to insure the Beaunit Building, in its then current condition, in 2003 and 2004.

assignment of a commercial lease violated the statute of frauds because the assignment was not in writing. *Lovoy v. Ratliff*, 156 So. 2d 857, 858-60 (Ala. 1964). The court held that despite the lack of writing, because the lessee occupied the premises and paid rent to the new landlord, the lease did not violate the statute of frauds. *Id.* at 860-61. The new landlord contended that the lessee never actually paid rent under the lease. *Id.* at 861. Nevertheless, the court rejected the argument, noting that the only reason the lessee did not pay rent was because the new landlord refused to accept the rent checks. *Id.* The court then held that "[w]here a party to a contract is the cause of the failure of the performance of the obligation due him, he cannot take advantage of that failure." *Id.* (citing World's Exposition Shows, 186 So. at 724).

Regarding the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim, U.S. Fire asserts that it made calculated offers to Stephens Wholesale in amounts higher than any estimate prepared by Stephens Wholesale's public adjusters, yet Stephens Wholesale refused to accept the offers.[10]  (Doc. 123 at 4, ¶ 5; Doc. 120 at 27.) So, similar to *Lovoy*, U.S. Fire argues that Stephens Wholesale made U.S. Fire's own performance impossible and that U.S. Fire should be released from further liability regarding the east/rear wall claims. (Doc. 123 at 4, ¶ 5-6.) Stephens Wholesale, however, responds that no settlement was reached because the parties could not agree on

---

[10] It seems that only U.S. Fire's July 18, 2006 offer of $92,383.63 for the February 5, 2004 wind loss claim, calculated on a RCV basis, was higher than any estimate prepared by Stephens Wholesale's public adjusters. (*See* Doc. 111, Ex. 21; Doc. 119, Ex. 29 at 7.) This is because Stephens Wholesale's July 18, 2005 offer of $98,013.88 did not take into account the $10,000 policy deductible. (Doc. 119, Ex. 29 at 7.)

critical components of the settlement offers, including the applicable rate of depreciation or the appropriate type of brick.  (Doc. 129 at 3, ¶ 6, 4, ¶¶ 7-9; Doc. 117 at 8, ¶ 8, 9, ¶ 12.) It also seems that no agreement was reached on the February 5, 2004 wind loss claim, despite Mr. Mullis's last compromise offer of $92,383.63, because Mr. Stephens felt mistreated regarding the claim and wanted to continue with the already pending lawsuit. (*See* Doc. 119 at Ex. 45; Doc. 119 at Ex. 47.)  Thus, unlike *Lovoy*, where the new landlord refused to accept rent payments for reasons wholly unrelated to the amount of the payments, Stephens Wholesale refused settlement offers because it disputed the settlement amounts themselves or the conditions, express or implied, placed on them.

U.S. Fire further argues that it never required a release for any of its ACV offers but only for its July 18, 2006 offer of $515,456.94.  (Doc. 133 at 5.)  It therefore notes that Mr. Stephens was free to accept payment for undisputed amounts without prejudicing his ability to seek additional payments on the claims.  (*Id.*)  What's more, U.S. Fire contends the "only obstacle to U.S. Fire's payment of undisputed . . . amounts to Plaintiffs was Charles Stephens' refusal to accept them."  (*Id.*)  From the evidence before the court, however, it is unclear whether U.S. Fire ever conveyed this option to Mr. Stephens.  Indeed, in Ms. Best's June 27, 2007 deposition, when asked whether she directed Mr. Mullis to convey to Mr. Stephens the option of accepting the ACV offers without a release, Ms. Best replied that she and Mr. Mullis "didn't have a conversation about it [and] [t]here was no discussion about having [Mr. Stephens] sign a release." (Doc. 118, Ex. 29 at 103, ll. 11-23, 104, ll. 1-11.)  Accordingly, as in *Tiller*, where

summary judgment was improper because of the parties' genuine dispute, and because evidence favoring Stephens Wholesale is to be believed, genuine issues of material fact exist as to whether Stephens Wholesale made performance by U.S. Fire impossible by refusing U.S. Fire's east/rear wall settlement offers.[11]

2.   The Hurricane Ivan Claims of September 20, 2004 Regarding the West Wall and Corners of the Front Building and Hurricane Ivan Claims of February 7, 2006 Regarding the Crane Bay Building and Acid Building (Doc. 112)

U.S. Fire states that summary judgment is due in its favor regarding the Hurricane Ivan claims of September 20, 2004 and February 7, 2006, because Stephens Wholesale failed to perform under the contract, the second element required of a breach of contract claim.  Additionally, U.S. Fire contends that Stephens Wholesale failed to prove that Hurricane Ivan caused the damage to the crane bay building and acid building, as required by the fourth element of a breach of contract claim.

---

[11] Although U.S. Fire argues that summary judgment is due in its favor as to the crane bay building and acid building claims because Stephens Wholesale failed to comply with a condition of the insurance policy, which required it to give U.S. Fire "prompt notice of the loss or damage," U.S. Fire did not make the same argument regarding the July 25, 2005 lightning strike claim.  *See infra* Part III.A.2.c.  Under Alabama law, when determining the reasonableness of a delay, courts consider "the length of the delay and the reasons for the delay."  *Pharr v. Cont'l Cas. Co.*, 429 So. 2d 1018, 1019 (Ala. 1983); *S. Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 883 (Ala. 1976).  This court has held as few as 108 days to be an unreasonably late delay in giving notice.  *Phoenix Assur. Co. of N.Y. v. Harry Harless Co.*, 303 F. Supp. 867, 870-72 (N.D. Ala. 1969).  Here, Stephens Wholesale failed to notify U.S. Fire of the July 25, 2005 lightning strike claim until November 1, 2005, over three months later.  (Doc. 119, Ex. 35 at 7, ¶ 2).  And, Stephens Wholesale offered no reason for the delay.  So, an argument could be made that the three month delay constitutes an unreasonably late delay.  But, because U.S. Fire has not made the argument, the court will not, *sua sponte*, decide it.

On September 2, 2008, U.S. Fire filed its "Motion for Final Declaratory Relief and/or Final Summary Judgment" (Doc. 112), as well as a brief in support (Doc. 114). Also on September 2, 2008, U.S. Fire filed a "Statement of Material Facts Believed by Defendant to be Undisputed" (Doc. 113). On September 9, 2008, Stephens Wholesale filed its "Evidentiary Submissions in Opposition to Defendants which are Believed to be Undisputed" (Doc. 115), and its "Opposition to Defendant's Motion for Final Declaratory Relief and/or Summary Judgment" (Doc. 116), but the magistrate-judge declared the two documents stricken for failing to comply with the court's summary judgment guidelines. (*See* Order re: Docs.116 and 115, Sept. 10, 2008.) Thereafter, on September 19, 2008, still within their time frame to present submissions, Stephens Wholesale filed a "Response to Defendant's Statement of Material Facts Believed by Defendant to be Undisputed" (Doc. 117).

a.      *U.S. Fire's Argument that Stephens Wholesale Made Performance Impossible*

As with the east/rear wall claims, U.S. Fire argues for summary judgment in its favor because Stephens Wholesale made performance by U.S. Fire impossible by refusing to accept U.S. Fire's Hurricane Ivan settlement offers. As previously discussed in greater detail, under Alabama law, "[w]here a party to a contract is the cause of the failure of the performance of the obligation due him, he cannot take advantage of that failure." *Lovoy*, 156 So. 2d at 861 (citing World's Exposition Shows, 186 So. at 724); *see also supra* Part II.A.1.b (discussing U.S. Fire's argument in the context of the east/rear wall claims).

U.S. Fire argues that it offered Stephens Wholesale $34,531.54 for the claimed damages to the west wall and corners of the front building.  (Doc. 114 at 8; Doc. 111, Ex. 2 at 5, ¶ 2.)  U.S. Fire notes it calculated the offer on an ACV basis and used information supplied by Stephens Wholesale's own engineer, but Mr. Stephens nevertheless rejected it.  (Doc. 114 at 8; Doc. 111, Ex. 2 at 5, ¶ 2.)  It also notes that Stephens Wholesale rejected a later compromise offer of $152,840.54, calculated on a RCV basis, which covered all Hurricane Ivan claims, including the crane bay building and acid building. (Doc. 114 at 8-9; Doc. 111 at Ex. 21.)  Based on the evidence before the court, it appears that Alex Sill's lowest RCV estimate for the west wall and corners was $66,172.97, $15,445.15 more than Mr. Mullis's RCV estimate used in calculating the $34,531.54 ACV offer.  (*See* Doc. 111, Ex. 7 at 7; Doc. 111, Ex. 12 at 2.)  What's more, the $152,840.54 RCV offer covered only  25% of the claimed damages to the crane bay building and acid building.  (Doc. 111 at Ex. 21.)  So, as with the east/rear wall claims, Stephens Wholesale rejected the Hurricane Ivan settlement offers because it genuinely disputed the settlement amounts themselves.  (*See* Doc. 117 at 4, ¶ 6; Doc. 118, Ex. 29 at 107, ll. 7-21.)  Therefore, because evidence favoring Stephens Wholesale is to be believed, a genuine issue of material fact exists as to whether Stephens Wholesale's refusal to accept U.S. Fire's Hurricane Ivan settlement offers made performance by U.S. Fire impossible.[12]

---

[12] U.S. Fire restates its argument that Stephens Wholesale had no reason to refuse the ACV offers regarding the west wall and corners of the front building because the offers did not require a release.  (Doc. 114 at 9.)  But, as aforementioned, it is unclear whether U.S. Fire ever

b.      *U.S. Fire's Argument that Stephens Wholesale Failed to Mitigate Damages*

U.S. Fire asserts that summary judgment is due in its favor regarding damages

subsequent to Hurricane Ivan because Stephens Wholesale failed to mitigate damages

after Hurricane Ivan.  Presumably, these subsequent damages include loss of rents and

higher deductibles.  (*See* Doc. 114 at 6-7; Doc. 24 at ¶¶ 5-6.)  In support, U.S. Fire

essentially offers the same arguments as it did when discussing Stephens Wholesale's

failure to mitigate damages following the February 5, 2004 wind loss claim.  *See supra*

Part III.A.1.a.  Thus, Stephens Wholesale's response that it was financially unable to

mitigate damages applies.  *See supra* Part III.A.1.a.  Specifically, when asked during his

deposition why Stephens Wholesale had not "gone back and fixed the roof" of the acid

building, Mr. Stephens replied: "Haven't had the money.  To put a new roof on that

building will cost you three and a half million dollars."  (Doc. 149 at 243, ll. 19-23.)

Because the duty to mitigate damages under Alabama law does not apply if the insured is

financially unable to do so, and because evidence favoring Stephens Wholesale is to be

believed, a genuine issue of material fact exists regarding Stephens Wholesale's duty to

mitigate damages after Hurricane Ivan.[13]  *See AVCO Fin. Servs. Inc. v. Ramsey*, 631 So. 2d

informed Mr. Stephens that a release was not required for ACV offers.  *See supra* Part III.A.1.b.

[13] U.S. Fire also argues that Stephens Wholesale's claims for damages regarding
increased insurance costs and loss of rents are due to be dismissed because counsel for Stephens
Wholesale stated that claims relating to increased insurance costs were not being made.  (Doc. 24
at 2, ¶ 5; Doc. 114 at 10; Doc. 111, Ex. 29 at 86, ll. 19-23, 87, ll. 1-3.)  In his deposition,
however, Mr. Stephens testified to the loss of rents and the inability to rent because of the
damage.  (Doc. 117 at 2, ¶ 68; Doc. 118, Ex. 28 at 117-18.)  Mr. Stephens also testified that he
has incurred increased deductibles in his replacement insurance.  (Doc. 118, Ex. 28 at 223, 225;
Doc. 111, Ex. 29 at 87.)  Therefore, Stephens Wholesale has claimed damages regarding loss

940, 942-43 (Ala. 1994); *Carnival Cruise Lines, Inc. v. Goodin*, 535 So. 2d 98, 103 (Ala. 1988).

c.      *U.S. Fire's Argument that Stephens Wholesale Did Not Give Timely Notice of the Crane bay Building and Acid Building Claims*

Finally, U.S. Fire argues that summary judgment is due in its favor as to the crane bay building and acid building claims because Stephens Wholesale failed to comply with a condition of the insurance policy, which required it to give U.S. Fire "prompt notice of the loss or damage."[14]  (Doc. 114 at 7; Doc. 111, Ex. 28 at 9 § 3a(2).)

The Alabama Supreme Court has held that when an insurance policy requires the insured to give timely notice, the insured must give notice "within a reasonable time in view of the facts and circumstances of the case."  *Pharr v. Cont'l Cas. Co.*, 429 So. 2d 1018, 1019 (Ala. 1983); *see also Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1055 (M.D. Ala. 2006) (holding that when an insurance policy requires "prompt notice . . . the insured must comply with that condition in a timely manner").  When determining the reasonableness of the delay, the court should consider first "the length of the delay and

---

rents and increased insurance deductibles.

[14] U.S. Fire also alleges that summary judgment is due in its favor as to the crane bay building and acid building claims because Stephens Wholesale prevented U.S. Fire from timely inspecting the property, despite the policy provision that requires Stephens Wholesale to, "[a]s often as may be reasonably required, permit [U.S. Fire] to inspect the property proving the loss or damage."  (Doc. 112 at 2, ¶ 2b; Doc. 111, Ex. 28 at 9 § 3a(6).)  This argument is addressed in conjunction with U.S. Fire's contention that Stephens Wholesale gave unreasonably late notice regarding the crane bay building and acid building claims.

[second] the reasons for the delay." *Pharr*, 429 So. 2d at 1019; *S. Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 883 (Ala. 1976).

Where no reason is offered for a lengthy delay, courts are inclined to hold, as a matter of law, that the insured failed to give notice within a reasonable time. *Pharr*, 429 So. 2d at 1019-20; *B & M Homes, Inc. v. Am. Liberty Ins. Co.*, 356 So. 2d 1195, 1195-96 (Ala. 1978). In *Pharr v. Continental Casualty Co.*, a former customer sued a steel company for negligent repair and breach of contract. 429 So. 2d at 1018. Almost eight months later, the steel company notified its insurer and requested that the insurer defend and indemnify it pursuant to the terms of the insurance policy. *Id.* at 1019. The insurer, however, argued that the steel company's delayed notice of almost eight months violated the terms of the policy, which required timely notice. *Id.* The court, recognizing that the steel company had "offered no excuses for the delay," held the delay to be "unreasonable as a matter of law." *Id.* at 1019-20; *see also B & M Homes, Inc.*, 356 So. 2d at 1195-96 (holding that a seven month delay was unreasonable as a matter of law when the insured offered no excuse for the delay).

In the instant case, U.S. Fire stresses that Stephens Wholesale did not inform it of the damages to the crane bay building and acid building until almost seventeen months after Hurricane Ivan, despite the policy provision that requires "prompt notice." (Doc. 114 at 8; Doc. 111, Ex. 2 at 5, ¶ 3; Doc. 111, Ex. 28 at 9 § 3a(2).) Also, U.S. Fire claims that Stephens Wholesale did not allow its experts to inspect the damages for an additional three months. (Doc. 114 at 8; Doc. 111, Ex. 2 at ¶ 6, 4-5.) Stephens Wholesale has not

46

disputed the delay occurred.  Furthermore, Stephens Wholesale has offered no reason for

it.  Thus, as in *Pharr*, where the court held an eight month delay to be unreasonable as a

matter of law when the steel company offered no excuse for the delay, Stephens

Wholesale's delay of almost seventeen months, when it offered no excuse, is likewise

unreasonable as a matter of law.  Therefore, even with all reasonable inferences drawn in

favor of Stephens Wholesale, U.S. Fire's Motion for Summary Judgment as to Stephens

Wholesale's claims regarding damages to the crane bay building and acid building is due

to be granted.


**B.      U.S. FIRE'S MOTION FOR SUMMARY JUDGMENT REGARDING THE
          BAD FAITH CLAIMS (DOC. 121)**

U.S. Fire claims that summary judgment is due in its favor regarding Stephens

Wholesale's claim that U.S. Fire acted in bad faith by failing to properly pay the February

5, 2004 wind loss claim and the July 25, 2005 lightning strike claim, as well as Stephens

Wholesale's claim that U.S. Fire acted in bad faith by failing to properly investigate the

claims.  U.S. Fire filed its Motion for Final Declaratory Relief and/or Final Summary

Judgment on October 3, 2008 (Doc. 121), along with a brief in support (Doc. 120).  On

October 22, 2008, Stephens Wholesale filed its Brief in Opposition to Defendant's

Motion for Final Declaratory Relief and/or Final Summary Judgment (Doc. 129), which

incorporated by reference the arguments made in its September 9, 2008 Opposition to

Defendant's Motion for Final Declaratory Relief and/or Summary Judgment (Doc. 116).

Thereafter, U.S. Fire filed a Brief in Reply to Plaintiffs' Opposition (Doc. 133).

Under Alabama law, there are two ways to establish a bad faith refusal to pay an insurance claim. *Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1314 (11th Cir. 2004) (citing Employees' Benefit Assoc. v. Grissett, 732 So. 2d 968, 976 (Ala. 1998)). An insurance company may be liable for either "normal" bad faith, i.e. failing to properly pay, or "abnormal bad faith," i.e. failing to properly investigate. *Id.* (citing State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 306 (Ala. 1999)).

1. <u>U.S. Fire's Argument that it Did Not Commit "Normal" Bad Faith</u>

To establish that an insurance company committed "normal" bad faith, i.e. bad faith refusal to pay an insurance claim, the insured must prove: "(1) a breach of the insurance contract; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal; and (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason."[15] *Id.* (citing Grissett,

---

[15] To establish "normal" bad faith, under subsection (2), the insured must demonstrate the insurance company's "intentional refusal to pay." *Henderson*, 368 F.3d at 1314. In the instant case, U.S. Fire has not expressly refused to pay Stephens Wholesale's claims, but instead refused to pay what Stephens Wholesale demands on the claims. However, under Alabama law an insured can establish a "constructive denial . . . by showing that the passage of time is so great that the delay alone creates a denial." *Slade*, 747 So. 2d at 317 n.6; *see also Jones v. Gen. Ins. Co. of Am.*, No. 07-0855-WS-C, 2009 WL 1537866, at *11 (holding that a delay of two years established a constructive denial). Stephens Wholesale first notified U.S. Fire of the February 5, 2004 wind loss claim on March 10, 2004, and the July 25, 2005 lightning strike claim on November 1, 2005. (Doc. 119, Ex. 1 at 1, ¶ 3; Doc. 119, Ex. 35 at 7, ¶ 2.) To date, approximately four and five years later, respectively, U.S. Fire and Stephens Wholesale have not reached an agreement on either claim. This passage of time alone creates a constructive denial

732 So. 2d at 976).  Under subsection (3), an "arguable reason" means a "'debatable reason' . . . one that is open to dispute or question." *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982) (citing Chavers v. Nat'l Sec. Fire & Cas. Co., 405 So. 2d 1, 10 (Ala. 1981)).  Simply put, unless the insured can establish that "he is entitled to a directed verdict on the [underlying] breach of contract claim," the insured cannot, as a matter of law, "have his [normal] bad faith claim submitted to a jury." *Henderson*, 368 F.3d at 1314 (citing Grissett, 732 So. 2d at 976).

When an insurance company has at least one arguable reason for nonpayment, the insurance company has not acted with "normal" bad faith. *See id.* at 1314-15.  In *Mutual Service Casualty Insurance Co. v. Henderson*, neighbors of the insured filed suit against the insured, seeking equitable relief to prevent the insured from operating a poultry-farming venture on the insured's land. *Id.* at 1311-12.  The insured requested that the insurer defend against the lawsuit. *Id.* at 1313.  The insurer, however, refused to defend against the suit, stating the insurance policy did not cover it. *Id.*  Specifically, the insurer noted that the policy covered "property damage" caused by an "occurrence"; an "occurrence" was defined in the policy as an "accident." *Id.* at 1313-15.  The court agreed as a matter of law, holding that the insured "*arguably* did not commit an 'accident,' but rather purposefully accepted the foreseen consequences of operating [the] poultry farm." *Id.* at 1315 (emphasis added).  The court therefore held that the insurer had not committed "normal" bad faith in denying the claim. *Id.*

---

and therefore Stephens Wholesale has satisfied subsection (2).

An arguable reason for nonpayment or lower payment exists when the insurer relies on independent experts and investigative reports. *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 34 (Ala. 2008) (citing Adams v. Auto-Owners Ins. Co. 655 So. 2d 969, 971-72 (Ala. 1995) (holding that the insurance company's reliance on the findings of two experts when denying a claim provided reasonably arguable and legitimate reasons for the denial)). In *Jones v. Alfa Mutual Insurance Co.*, winds from Hurricane Opal damaged parts of the insured's house and cattle farm. *Id.* at 25. When investigating the claim, the insurance company hired an independent structural engineer to inspect the house. *Id.* Thereafter, the structural engineer submitted a report to the insurance company, concluding that part of the claimed damage was not caused by winds from Hurricane Opal. *Id.* at 26. Relying on the report, the insurance company denied part of the insured's claim. *Id.* at 27. The insured subsequently brought multiple claims against the insurance company, including a claim for "normal" bad faith. *Id.* at 28-29. When analyzing the insured's claim for "normal" bad faith, the court noted that the structural engineer's report "create[d] a question of material fact that would preclude the [insured] from receiving a preverdict judgment as a matter of law on the underlying breach-of-contract claim." *Id.* at 34. Therefore, the court affirmed the lower court's grant of summary judgment on the "normal" bad faith claim. *Id.*

Stephens Wholesale first argues that U.S. Fire acted with "normal" bad faith by "[u]sing an excessive depreciation rate to low-ball the offer in combination with the insisting on a full release." (Doc. 129 at 8-9.) U.S. Fire argues that summary judgment is

due in its favor regarding "normal" bad faith, because it, as in *Jones* and *Adams*, relied on independent experts, and their reports when calculating settlement offers. (Doc. 120 at 4.) Specifically, upon notice of Stephens Wholesale's claim, U.S. Fire hired the independent adjuster, Mr. Eric Blaylock, employed by Premiere Insurance Adjusters, Inc. (Doc. 119, Ex. 1 at 1, ¶ 1.) U.S. Fire later, pursuant to Mr. Blaylock's request, hired a local contractor, Mr. Eric Parrish, and a structural engineer, Mr. Ronald E. Martin. (*Id.* at 4, ¶ 3, 5, ¶ 1, ¶ 3.) Both of these experts filed reports, which Mr. Blaylock and U.S. Fire relied on when calculating settlement offers.[16] (*Id.* at 5, ¶ 2; Doc. 119, Ex. 11, Ex. B at 3, ¶ 5.) What's more, when settlement discussions slowed, U.S. Fire hired Mr. Mike Mullis of Vericlaim, Inc. (Doc. 119, Ex. 35, at 2, ¶ 2, 7, ¶ 3.) He in turn recommended, and U.S. Fire agreed, that U.S. Fire hire an additional structural engineer, Mr. Charles Whitley of Engineering Design & Testing Corp., and a building consultant, Mr. Chris Witcher of Belfor U.S.A. Group, Inc. (*Id.* at 5, ¶ 3, 7, ¶ 4.) Both Mr. Whitley and Mr. Witcher filed reports, which Mr. Mullis and U.S. Fire relied on when calculating settlement offers. (*Id.* at 6 ¶ 5; Doc. 119, Ex. 42 at 6.) Stephens Wholesale has not suggested that U.S. Fire did not rely on these experts and their reports when calculating settlement offers, but instead

---

[16] For example, in determining the applicable rate of depreciation regarding the east/rear wall, Mr. Blaylock consulted Mr. Martin. (Doc. 119, Ex. 1 at 9, ¶ 4.) Mr. Martin conducted research and advised Mr. Blaylock that it would be fair and reasonable to apply a 100 year life expectancy to the wall (equating to a depreciation rate of 1% per year). (Doc. 119, Ex. 11 at 4, ¶ 2.) Considering the building's age, Mr. Blaylock's opinion, and Mr. Martin's opinion, U.S. Fire used the 1% per year figure when selecting depreciation rates of 45%, and later 5% and 56%. (Doc. 119, Ex. 1 at 9, ¶¶ 1-3, 10, ¶ 2.)

disagrees with the experts' conclusions.[17]  Therefore, as in *Jones* and *Adams*, U.S. Fire's reliance on independent experts and investigative reports when calculating the settlement offers creates an arguable reason for its offers in amounts lower than that requested by Stephens Wholesale.[18]

Stephens Wholesale also argues that U.S. Fire's specific policy of "refusing to pay the minimal, undisputed amounts unless [Stephens Wholesale] signed a full release" indicates "normal" bad faith.  (Doc. 129 at 8-9.)  Despite the extensive briefing by the parties, the values of the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim are hardly undisputed.[19]  (*See* Doc. 118, Ex. 29 at 107, ll. 7-21.)  Indeed, it may be undisputed that U.S. Fire offered to settle the claims for ranging amounts, but genuine issues of fact nevertheless remain on what the claims are worth, as well as

---

[17] What's more, Stephens Wholesale's own independent adjuster, Mr. Mike Werner, testified regarding the applicable rate of depreciation that "[t]here is no hard and fast rule as to how you come up with depreciation."  (Doc. 119, Ex. 27 at 105, ll. 14-15.)  Stephens Wholesale's other adjuster, Mr. Keith Brenneman, likewise testified that the east/rear wall claim "was the type of loss that would be right for that kind of negotiation since there was [sic] some gray areas" including the wall's age and the applicable rate of depreciation.  (Doc. 119, Ex. 16 at 122, ll. 20-25, 123, ll. 1-13.)  And, for all that, U.S. Fire calculated its July 18, 2006 offer on a RCV basis, with no deduction for depreciation.  (Doc. 119 at Ex. 44; Doc. 119 at Ex. 45.)

[18] Stephens Wholesale also seems to argue that U.S. Fire acted with "normal" bad faith by calculating settlement amounts that were "admittedly deficient due to not using materials of like kind and quality."  (Doc. 129 at 8-9.)  U.S. Fire notes that it relied on Mr. Mullis's opinion and Mr. Whitley's report when selecting the $6.50 block of like kind and quality to use in the calculations.  (Doc. 133 at 6; Doc. 119, Ex. 35 at 8, ¶ 5; Doc. 119, Ex. 55 at 2, ¶¶ 2-3.)  U.S. Fire's reliance on these two experts creates an arguable reason for its offers that included the $6.50 brick.

[19] It is important to note that although Stephens Wholesale claims the existence of an undisputed amount, it has not offered evidence showing an agreement between it and U.S. Fire as to the exact amount of the undisputed amount.

whether Stephens Wholesale fully performed under the insurance contract.  (*Id.*; *see supra* Part III.A.1) (holding that genuine issues of material fact exist as to whether Stephens Wholesale performed under the insurance contract).  Stephens Wholesale is merely attempting to convert U.S. Fire's offers in compromise into evidence of the existence of undisputed amounts, which U.S. Fire is legally liable to pay, and that its failure to do so demonstrates "normal" bad faith.  Such a policy would place a burden on insurance companies to always make partial payments during settlement negotiations, even on disputed claims.  And, while U.S. Fire was free to make such payments, neither the insurance policy at issue nor the law in Alabama require it to do so; the fact that U.S. Fire has not done so does not demonstrate "normal" bad faith.  *See Jones*, 1 So. 3d at 34 (holding that insurance company did not act with "normal" bad faith by refusing insured's settlement demand where arguable reason existed for the refusal).

At any rate, the record indicates that only one of U.S. Fire's settlement offers, the $515,456.94 offer of July 18, 2006, required a release.  (Doc. 119, Ex. 46 at 101, ll. 5-21.) None of the ACV offers expressly required a release.  (*Id.* at 102, ll. 2-21.)  Indeed, in Ms. Best's June 27, 2007 deposition, she stated that she and Mr. Mullis never had a "discussion about having [Mr. Stephens] sign a release for the ACV payment[s]."[20]  (Doc.

---

[20] Stephens Wholesale points to a U.S. Fire internal document from Mr. Mullis to Ms. Best as evidence of U.S. Fire's insistence on a release in return for payment of undisputed amounts.  (Doc. 140 at 4; Doc. 118 at Ex. 26.)  In the document, Mr. Mullis informed Ms. Best that "[Mr. Stephens] then requested that the undisputed ACV amounts be paid on all claims immediately and [Mr. Stephens] asked why that had not yet been offered especially on the original wall collapse claim."  (Doc. 118, Ex. 26 at 1.)  Seemingly, no response from Ms. Best exists.  That said, the document does not establish the existence of an undisputed amount or even create a "reasonable" inference as to its existence.  *See Graham v. State Farm Mut. Ins. Co.*, 193

118, Ex. 29 at 103, ll. 11-23, 104, ll. 1-11.)  Instead, the record indicates simply that

Stephens Wholesale disagreed with the amounts or conditions of U.S. Fire's settlement

offers, rejected the offers, and asked for higher amounts.  (Doc. 133 at 5; Doc. 117 at 4, ¶

6.)  And because U.S. Fire, as in *Jones* and *Adams*, relied on expert opinions and

investigative reports when refusing to offer higher amounts or a lower rate of

depreciation, an arguable reason exists for its refusal.  Therefore, even with all justifiable

inferences drawn in favor of Stephens Wholesale, U.S. Fire's Motion for Summary

Judgment regarding Stephens Wholesale's claim that U.S. Fire acted with "normal" bad

faith by failing to properly pay the February 5, 2004 wind loss claim and the July 25,

2005 lightning strike claim is due to be granted.[21]

---

F.3d 1274, 1282 (11th Cir. 1999) (citing Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)) (holding that the non-moving party "need not be given the benefit of every inference but only of every *reasonable* inference") (emphasis added).  And further, as previously discussed, U.S. Fire had no duty to make partial payments on disputed claims after Stephens Wholesale rejected its settlement offers.  The fact that Ms. Best was on notice that Mr. Stephens wanted U.S. Fire to do so changes nothing.

[21] Although Stephens Wholesale states that its arguments regarding bad faith "apply to all three of the claims at issue," none of the evidence it offers sufficiently infers bad faith as to the Hurricane Ivan claims.  (*See* Doc. 116; Doc. 129 at 8-9; Doc. 139 at 34.)  Moreover, as discussed above, drawing all reasonable inferences in favor of the plaintiff, U.S. Fire had an arguable basis for nonpayment of the Hurricane Ivan claims because it relied on expert opinions and investigative reports when calculating its settlement offers.  Therefore, to the extent Stephens Wholesale claims that U.S. Fire acted with "normal" bad faith regarding the Hurricane Ivan claims, U.S. Fire's Motion for Summary Judgment is due to be granted.

2.    <u>U.S. Fire's Argument that it Did Not Commit "Abnormal" Bad Faith</u>

Under Alabama law, courts have limited "abnormal" bad faith cases, i.e. bad faith

failure to investigate an insurance claim, to those instances in which an insured showed

that the insurance company:

> (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

*State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306-07 (Ala. 1999).  Although

"normal" bad faith requires "'the underlying contract claim . . . be so strong that the

plaintiff would be entitled to a preverdict judgment as a matter of law,'" "abnormal" bad

faith does not "'if the insurer had recklessly or intentionally failed to properly investigate

a claim or . . . subject the results of its investigation to a cognitive evaluation.'"  *Jones v.*

*Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008) (quoting White v. State Farm Fire & Cas.

Co., 953 So. 2d 340, 348 (Ala. 2006); Shelter Mut. Ins. Co. v. Barton, 822 So. 2d 1149,

1155 (Ala. 2001)).

When an insurance company denies a claim without examining available evidence

that directly challenges its basis for the denial, courts hold the insurance company

intentionally or recklessly failed to investigate the claim and therefore acted with

"abnormal" bad faith.  *See id.* at 36-37; *see also Slade*, 747 So. 2d at 315-16 (holding that

insurance company's failure to investigate whether lightning struck insured's dwelling

before denying insured's claim created a question of fact regarding abnormal bad faith

because lightning damage was a covered event).  In *Jones v. Alfa Mutual Insurance Co.*, the insured homeowner submitted a claim to its insurance company for damages to his house and cattle farm caused by winds from Hurricane Opal.  1 So. 3d at 25.  Specifically, he claimed the winds created cracks in the interior drywall and ceiling of the house, as well as in the exterior brick veneer.  *Id.*  The insurance company sent two agents to inspect the damage.  *See id.*  When one of the agents doubted whether the winds caused the interior and exterior cracks, the insurance company hired a structural engineer.  *Id.* Later, after conducting his own inspection of the house, the engineer concluded that shifting in the settlement of the foundation, not Hurricane Opal, caused the interior and exterior cracks.  *Id.* at 25-26.  Relying on the engineer's report, the insurance company subsequently denied that part of the homeowner's claim, though the parties disputed the exact date of the denial.  *See id.* at 29-31.

Thereafter, the homeowner filed suit against the insurance company, claiming in part that it acted with "abnormal" bad faith.  *Id.* at 31.  Specifically, he claimed the insurance company never collected or considered any "'before and after' evidence," even though multiple individuals had visited the house shortly before Hurricane Opal, including one of the insurance company's own agents, who had conducted a "rewrite" inspection of the house.  *Id.* at 34-37.  What's more, the agent had taken photographs of the house's exterior during the "rewrite" inspection and later testified that "he did not recall seeing any cracks in the interior or exterior walls of the [insured's] house when he conducted the 'rewrite' inspection."  *Id.* at 36-37.  The insurance company never

56

interviewed the agent regarding the inspection and never considered the photographs taken during it. *Id.* The court held that "'an insurance company has a responsibility to marshal all . . . facts' necessary to make a determination as to coverage *before* its refusal to pay'" *Id.* at 37 (quoting Slade, 747 So. 2d at 316). And, because the insurance company never considered the "rewrite" inspection or interviewed the agent who conducted it, the court held that a question of material fact existed regarding the homeowner's claim for "abnormal" bad faith. *Id.*

When an insurance company "creates" a debatable reason for denying a claim, without investigating known alternatives, the insured may have a cause of action for "abnormal" bad faith. *See Slade*, 747 So. 2d at 306; *Jones v. Ala. Farm Bureau Mut. Cas. Co.*, 507 So. 2d 396, 400-01 (Ala. 1986). In *Jones v. Alabama Farm Bureau Mutual Casualty Co.*, a homeowner submitted a claim to her insurance company for damages to several items of personal property, including a television set. 507 So. 2d at 397. The homeowner claimed that lightning struck the house and "directly" caused the damage, a covered loss under her policy. *Id.* Thereafter, the adjuster assigned to the claim interviewed the homeowner's husband. *Id.* The adjuster alleged that the husband told him that the damage resulted when a tree limb fell on a power line approximately seven hours after the lightning struck the house. *Id.* In response, the husband denied ever making the statement, alleging the adjuster had simply made it up. *Id.* And, while the husband acknowledged a tree limb had fallen on the power line, he refuted that it caused the damage. *Id.* Nevertheless, relying solely on the husband's alleged statement, and

without first investigating the lightning strike, the insurance company denied the homeowner's claim; it reasoned that her policy did not cover damages caused "indirectly." *Id.* Thereafter, the homeowner filed suit against the insurance company, alleging "abnormal" bad faith. *Id.* at 398. The court agreed, noting that "it would frustrate the purpose of the bad faith action by allowing an insurer simply to misrepresent the content of an oral conversation to avoid liability. *Id.* at 401. It therefore held that summary judgment in favor of the insurance company on the homeowner's "abnormal" bad faith claim was improper. *Id.*

Regardless of how an insured alleges "abnormal" bad faith, to survive summary judgment the insured must still demonstrate that the insurance company acted with a "dishonest purpose" and breached a "'known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'" *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (quoting Slade, 747 So. 2d at 303-04); *see also Pioneer Servs., Inc. v. Auto-Owners Ins. Co.*, No. 2:06-cv-377-WKW, 2007 WL 2059109, at *7-*9 (M.D. Ala. 2007) (discussing the "dishonest purpose" requirement for claims alleging "abnormal" bad faith). In *Singleton v. State Farm Fire & Casualty Co.*, insured homeowners submitted a claim to their insurance company regarding damages to their house, specifically the recently replaced roof, following a wind storm. 928 So. 2d at 282. The insurance company sent an agent to inspect the roof's damage. *Id.* Although the homeowners presented the agent with two roofing estimates, which called for the complete replacement of the roof, the agent responded that, based on her experience, she

thought the roof could be repaired for less than the homeowners' deductible. *Id.* She therefore denied their claim. *Id.* Following the denial, the homeowners requested the agent reconsider her decision and again submitted the two roofing estimates. *Id.* Although the agent did not meet with either of the roofing companies that prepared the estimates, despite the insurance company's policy as stated in its claims manual, she did call one of the companies. *Id.* at 284-85. And, in an activity log for the homeowner's claim, the agent noted that the roofing company informed her that its estimate was for a different type of roof than the homeowners' roof and further that it could repair a new roof for less than $250. *Id.* at 285. The agent again denied the homeowners' claim. *Id.*

Following the second denial, the homeowners filed suit against the insurance company alleging, in part, "abnormal" bad faith. *Id.* at 282-83. Specifically, the homeowners argued that the insurance company failed to adequately investigate their claim because the agent had no real experience, failed to follow the claims manual, and instead "simply made her own determination . . . that the roof could be fixed by patching rather than by full replacement." *Id.* at 284. The court, however, noted that the agent partially relied on the conversation she had with one of the roofing companies when denying the claim, as evidenced by her notation in the activity log. *Id.* at 286. And, at any rate, it stated that the homeowners had not "adduce[d] sufficient evidence of a 'dishonest purpose' or 'breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will,'" as required in a bad faith action. *Id.* at 286-87 (quoting Slade, 747 So. 2d at 303-04). The court reasoned that the agent's failure to

comply with the claims manual "may [have] indicate[d] bad judgment or negligence," but not bad faith.  *Id.*  It therefore affirmed the summary judgment ruling in favor of the insurance company regarding the "abnormal" bad faith claim.  *Id.* at 287.

In the instant case, unlike *Jones v. Alfa Mutual Insurance Co.*, Stephens Wholesale has not offered evidence demonstrating that U.S. Fire failed to examine available evidence or that it recklessly failed to investigate the claims.[22]  Instead, Stephens Wholesale merely disagrees with the conclusions U.S. Fire reached from the investigation, such as a 45% depreciation rate and a $6.50 replacement brick.  (*See* Doc. 129 at 4, ¶¶ 7-9, 8, ¶ 7.)  That said, the argument that U.S. Fire refused to pay the correct amount regarding damages to the east/rear wall, if true, alleges only "normal" bad faith, not "abnormal" bad faith.  *See supra* Part III.B.1.

---

[22] Indeed, it is undisputed that U.S. Fire hired and consulted numerous independent adjusters, building consultants, and structural engineers, to investigate Stephens Wholesale's claims, including Mr. Eric Blaylock, Mr. Eric Parrish, Mr. Ronald E. Martin, Mr. Mike Mullis, Mr. Charles Whitley, Mr. Chris Witcher, and Mr. Leonard Quick.  (*See* Doc. 119, Ex. 1 at 1, ¶ 1, 4, ¶ 3, 5, ¶ 1, ¶ 3; Doc. 119, Ex. 35, at 2, ¶ 2, 5, ¶ 3, 7, ¶¶ 3-4; Doc. 119, Ex. 50 at 1, ¶ 1.)  Further, Stephens Wholesale has not alleged that these individuals were unqualified to conduct the investigation.  For example, Mr. Stephens's insurance agent, Mr. Donald W. Boatright, testified that Mr. Mullis "seemed to be a good adjustor" and "knew what he was doing."  (Doc. 119, Ex. 37 at 130, ll. 17-23, 131, ll. 2-4.)  Also, it is undisputed that U.S. Fire's experts worked closely and cordially with Stephens Wholesale's own experts.  For instance, Mr. Werner testified that he was "able to work with Mr. Mullis," that Mr. Mullis was "responsive to [his] phone calls and letters," and that he and Mr. Mullis were "of one mind with respect to the extent of the repairs that needed to be made" regarding the east/rear wall.  (Doc. 119, Ex. 27 at 62, ll. 21-23, 63, ll. 22-25, 64, ll. 1-7, 65, ll. 3-6.)  Finally, Stephens Wholesale does not claim that U.S. Fire failed to perform a sufficient number of on-site inspections or marshal all the pertinent facts regarding the east/rear wall claims.  Indeed, U.S. Fire conducted six on-site inspections after the initial damage to the east/rear wall and accumulated "before" evidence dating back to 1990.  (*See* Doc. 120 at 21; Doc. 119 at Ex. 50.)  Therefore, unlike *Jones v. Alfa Mutual Insurance Co.*, U.S. Fire did not recklessly fail to investigate the claims prior to calculating its settlement offers or deciding to reject Stephens Wholesale's counteroffers.

Stephens Wholesale also seems to contend, as with its arguments alleging "normal" bad faith, that U.S. Fire's specific policy of "refusing to pay the minimal, undisputed amounts unless [Stephens Wholesale] signed a full release" also indicates "abnormal" bad faith.  (*See* Doc. 129 at 8-9; Doc. 116 at 15-16.)  But again, arguments regarding U.S. Fire's refusal to pay, if true, allege only "normal" bad faith, not "abnormal" bad faith.  *See supra* Part III.B.1.

Stephens Wholesale does, however, state that U.S. Fire "created" the dispute regarding the scope and extent of damage to the east/rear wall.  (Doc. 116 at 15.)  Presumably, as in *Jones v. Alabama Farm Bureau Mutual Casualty Co.*, such an allegation could fit within subsection (3) of how an insured can establish "abnormal" bad faith, i.e. by showing that the insurance company "created its own debatable reason for denying the plaintiff's claim."  *Slade*, 747 So. 2d at 306-07.  However, it is undisputed that U.S. Fire relied on numerous experts, on-site inspections, and investigative reports when calculating the scope and extent of damage to the east/rear wall.  *See supra* note 22.  What's more, Stephens Wholesale's own adjuster, Mr. Keith Brenneman, testified that the east/rear wall claim "was the type of loss that would be right for that kind of negotiation since there was [sic] some gray areas" including the wall's age and the applicable rate of depreciation.  (Doc. 119, Ex. 16 at 122, ll. 20-25, 123, ll. 1-13.)  So, unlike *Jones*, where the insurance company relied solely on a disputed, and possibly made up conversation when denying the homeowner's claim, the undisputed evidence shows that U.S. Fire did not "create" the dispute, but instead calculated settlement offers based on an extensive

investigation; Stephens Wholesale's conclusory allegation to the contrary is insufficient to create a genuine issue of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (noting that "conclusory allegations . . . in the absence of supporting evidence, are insufficient to withstand summary judgment" (citing Gordon v. Barnes Pumps, Inc., 999 F.2d 133, 138 (6th Cir. 1993))).

Finally, as in *Singleton*, where summary judgment regarding the homeowners' "abnormal" bad faith claim was proper because the homeowners had not offered evidence showing the insurance company acted with a "dishonest purpose," Stephens Wholesale has likewise failed to offer evidence showing U.S. Fire acted with a "dishonest purpose" or harbored a "motive of self-interest or ill will."[23] *See* 928 So. 2d at 286-87. Instead, with the exception of the Beaunit Building claims, the undisputed evidence shows that Mr. Mullis settled all of the approximately thirty-eight property claims submitted by Mr. Stephens. (Doc. 119, Ex. 35 at 2.) Indeed, Mr. Stephens testified that throughout the investigation, Mr. Mullis had "always been cordial with [him]" and that he had "not seen any indication of maliciousness by Mr. Mullis . . . [o]r any bad intent." (Doc. 119, Ex. 21 at 79, ll. 9-23, 80, ll. 1-2.) Stephens Wholesale's disagreements with the amounts of the

---

[23] Stephens Wholesale argues that "the U.S. Fire file shows that as early as October, 2004, they were planning on using theories of defective materials and defective conditions on" the [east/rear wall] claims. (Doc. 116 at 8; Doc. 119, Ex. 24 at 2.) Such an accusation, if supported, could show U.S. Fire's intentional or reckless failure to investigate the east/rear wall claims, accompanied by a dishonest purpose. But, the evidence Stephens Wholesale cites notes only that U.S. Fire considered "defective constrcution [sic]" and "defective materials" to be "[p]otential [t]heories." (Doc. 119, Ex. 24 at 2.) And, at any rate, Stephens Wholesale has offered no evidence inferring that U.S. Fire actually relied on this unsupported speculation rather than expert opinions and investigative reports when calculating its settlement offers.

settlement offers, or their conditions, such as the rate of depreciation or materials used, without more, simply does not infer a dishonest purpose.  Thus, even with all justifiable inferences drawn in favor of Stephens Wholesale, U.S. Fire's Motion for Summary Judgment regarding Stephens Wholesale's claim that U.S. Fire acted with "abnormal" bad faith by failing to properly pay the February 5, 2004 wind loss claim and the July 25, 2005 lightning strike claim is due to be granted.[24]

## CONCLUSION

For the foregoing reasons, the court is of the opinion that the Magistrate Judge's Report regarding document 123 (breach of contract claims for the damage to the east/rear wall) is due to be ADOPTED IN PART and REJECTED IN PART, and his Recommendation is due to be ACCEPTED.  Defendant's Objections are due to be OVERRULED; defendant's "Motion for Declaratory Relief and/or Final Summary Judgment with Respect to Breach of Contract Claims for Damage to the East/Rear Wall" (Doc. 123) is due to be DENIED.  Further, the court is of the opinion that the Magistrate Judge's Report regarding document 112 (breach of contract claims for damage caused by Hurricane Ivan) is due to be ADOPTED IN PART and REJECTED IN PART, and his

---

[24] As discussed earlier, although Stephens Wholesale states that its arguments regarding bad faith "apply to all three of the claims at issue," none of the evidence it offers sufficiently infers bad faith as to the Hurricane Ivan claims.  (*See* Doc. 116; Doc. 129 at 8-9; Doc. 139 at 34.) Moreover, as discussed above, drawing all reasonable inferences in favor of the plaintiff, U.S. Fire had an arguable basis for nonpayment of the Hurricane Ivan claims because it relied on expert opinions and investigative reports when calculating its settlement offers.  Therefore, to the extent Stephens Wholesale claims that U.S. Fire acted with "abnormal" bad faith regarding the Hurricane Ivan claims, U.S. Fire's Motion for Summary Judgment is due to be granted.

Recommendations are due to be ACCEPTED IN PART and REJECTED IN PART.

Defendant's Objections are due to be SUSTAINED IN PART and OVERRULED IN

PART; defendant's "Motion for Final Declaratory Relief and/or Final Summary Judgment

with Respect to Claims for Damage Caused by Hurricane Ivan" (Doc. 112) is due to be

GRANTED IN PART and DENIED IN PART.  Finally, the court is of the opinion that

the Magistrate Judge's Report regarding document 121 (bad faith claims) is due to be

ADOPTED IN PART and REJECTED IN PART, and his Recommendation is due to be

ACCEPTED.  Plaintiff's Objections are due to be OVERRULED; defendant's "Motion

for Final Declaratory Relief and/or Final Summary Judgment with Respect to Claims for

Damage to the East/Rear Wall Contract and Bad Faith" (Doc. 121) is due to be

GRANTED.  An Order in conformity with this Memorandum Opinion will be entered

contemporaneously.

     **DONE** this 28th day of September, 2009.


_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE